GULF & S. I. R. Co. *v.* BOND *et al.*

(Division B. March 7, 1938. Suggestion of Error overruled April 18, 1938.)

[179 So. 355. No. 33050.]

256

■■■■■■■■■■■■■■

■■■■■■■■■■■

■■■■■■

[181 So. 741.   No. 33050.]

■■■■■■

Creekmore, Creekmore & Capers, of Jackson, **W. C. Batson**, of Wiggins, **E. C. Craig**, of Chicago, Ill., and **Burch, Minor & McKay**, of Memphis, Tenn., for appellant.

258

**U. B. Parker,** of Wiggins, for appellee.

260

Argued orally by **H. H. Creekmore** for appellant and by **U. B. Parker** for appellee.

**Ethridge, P. J.,** delivered the opinion of the court.

This is an appeal from a judgment of the circuit court of Stone county in favor of appellees, Mrs. Lois Bond and two minor children, and against the appellant, in the sum of $10,000, for the wrongful death of Carson Bond, husband of Mrs. Bond, and father of the two minor children. Bond was struck and killed by a train of the appellant on the night of December 24, 1936, in the corporate limits of the town of Wiggins. At the time of his death he was twenty-four years of age, with a life

expectancy of 39.49 years, and earned $12 a week, which the evidence shows was practically all spent in support of his family. His widow was twenty-three years of age, and the children one and three, respectively.

Appellant's passenger depot in the town of Wiggins is north of Pine street, which runs east and west, while the line of the railroad runs north and south. Pine street is 60 feet wide. The platform of the depot extends from a point north of Pine street to a point 150 feet south of it, being built of gravel along the east side of the main line of the railroad. The main line track for a distance of a quarter of a mile south of the depot is straight, but at this point there is a curve. The depot grounds on both sides of the track, for about 150 feet, were in constant use by the general public; people being on and around said premises frequently.

The train which killed Bond was a passenger train, due at Wiggins at 6:30 p. m., but was about five minutes late. There was no eyewitness to the accident in which Bond and another man were killed by the train as it came in from the south.

A witness for the plaintiffs, John Dees, funeral director who prepared the body for burial, testified that the deceased was struck on the right side, his arm being crushed, his ribs broken, and the right leg, between the hip and the knee, had a long gash cut to the bone, approximately eight inches in length, with other scratches and bruises which were slight.

Early Felder, a colored witness, testified that he heard the train blow and bell ring as the train came into the depot; that he went around the train, on his way to the store to get a hat, and in doing so found the two men lying by the track, unconscious, at a spot below the roadway farther down the track, where the ground was covered with Bermuda grass, being little used by people passing to and fro.

Another witness, Clifton Brown, testified that he was

in Wiggins on the day of the accident, and remembered the arrival of the train; that he was on the east side of the track at the time, and saw it coming in at a speed of about 25 miles an hour, heard the whistle when it was down the track at the curve, a quarter of a mile south of the depot, but was unable to say whether the bell was ringing; that the train had a bright electric headlight, and that although he looked down the track he saw no one in front of it. He testified that a gravel platform for the use of passengers getting on and off the trains lies south of Pine street; that when he first walked up as the train was coming down the track, blowing the whistle, he saw a man whom he took to be Carson Bond standing in the door of the restaurant; that after the train came to a stop he went around it on his way to the restaurant, and stumbled over one of the bodies in the dark; Bond was lying about ten steps north of the end of the gravel platform, on the west side of the track, and eight or ten feet south of the north end of the warehouse, and the other about ten steps farther south.

Minus, witness for the plaintiffs, testified that as the train approached he was coming from the corner drug store; that he observed the train, but paid no attention to its rate of speed. He first heard of the accident when a colored man said the train had killed two men; he fixed the location of the bodies north of the warehouse, 23 and 28 feet, respectively, from its south end, on the west side of the track, and two or three feet from the cross-ties. He described the injuries sustained by Carson Bond substantially as testified to by the funeral director, Mr. Dees. This witness testified that as the train was coming in he saw Mr. Hughes standing on the main track, and Mr. Bond, facing east, standing between the main line and the switch, south of the Pine street crossing, about 20 or 30 feet north of where the bodies were later found; that to reach that point they would have to go south from where he had seen them, at the time he heard

the train; but he did not look down the track, did not observe the light, and did not know whether the train had come around the curve.

Another witness for the plaintiff, Orbrey Breeland, testified that he was at the crossing when the train came in, which he remembered for the reason that he had started to cross the track when he heard it coming, and backed his car and waited, going to the drug store, where he heard a colored man say that two men had been hit by the train. He thereupon went to the place where the bodies lay, on the west side of the track, Bond some twelve or fifteen feet to the north of Hughes, with his head toward the north. This witness estimated that the locomotive was running some twenty or twenty-five miles an hour—guessed the whistle blew, but paid no attention to it; that he heard the train about fifty steps south of the crossing, glanced down the track, but saw no one on it; that the boys were not struck on the crossing, the bodies being found south of the road near the restaurant, a place much used by the public; the ground on which the bodies lay was off the traveled part of the road.

C. L. Holliman, a witness for the plaintiff, testified that the gravel platform of the railroad, 12 feet wide, is nearly level with the track, lying to the east thereof, south of Pine street, about 150 feet south of the crossing. He further testified that the witness Brown gave the alarm that something was wrong, and that he went down and found Bond lying dead, as he thought; that he ran around the end of the train and tried to stop the engineer, but the train was already pulling out. This witness described the injuries suffered by Bond substantially as stated by the funeral director. He testified that by measurement it was 110 feet from the south side of Pine street to the point where Mr. Bond's body was found, and that the other body lay about 20 feet below that; that there was no traffic where the bodies were found, only an occasional person passing over the track there.

That he heard the train blow, as usual, down the track about the first switch, but did not hear the bell ring, although the headlight was burning when the train reached the crossing; and that no one was struck on the crossing.

Another witness for plaintiffs, Manuel Bond, brother of the deceased, testified that he was in a car with the witnesses, Mr. Davis and Mr. West, that night, and when they crossed the track he saw his brother, Carson Bond, with Bourbon Hughes, standing between the side track and the main line, about 35 feet south of Pine street; crossing the track in front of the train he went to his home in Bond, but afterwards returned to Wiggins, where he learned of the death of his brother. He did not know how his brother was hit, but saw the train coming in, the light shining down the track about where the switch is; saw his brother between him and the light from the train as he stood on the track or ground in front of the light; that when he and his companions crossed the track, their car going about fifteen miles an hour, the train was about at the switch, the headlight brightly illuminating the straight track. His brother seemed to be standing to the side facing east, with the light on him, and there was nothing to keep him and his companion from seeing the train. West and Davis testified substantially to the same facts.

Another witness, Willie Smith, testified that he came up town about 6 o'clock in the evening, met Winton Taylor at the corner of the drug store, and walked to a hardware store; that as they were standing by a shoe store they saw Carson Bond, the deceased, come out of the restaurant. The witness was to the west of the warehouse, taking a drink with Winton Taylor, when they saw Bond and Hughes leave the restaurant, going southward toward the railroad, where they passed from sight behind the warehouse. The witness was 150 feet from the warehouse to the southwest when he heard the train blow its regular whistle for the crossing, being then

about 500 feet from where the bodies were afterwards found; he did not hear any danger signal blown; Bond and Hughes were walking south along the track when he saw them, in a direct line with the train, the headlight of which was burning, and there was nothing between the boys and the train to obstruct the view of the engineer or fireman. He testified that there was nothing to keep the boys from hearing and seeing the train if they had normal eyesight.

Wint Taylor testified substantially to the same effect; and also said that if the train blew any danger signal close to the Thomas warehouse he did not hear it.

Mrs. John Bond testified that she and Mrs. Rayburn were sitting in a car on the east side of the track when the train came in, their attention being drawn to it because of the noise it made; it blew no danger signal just below the crossing, and she heard no signals at the lower end of the town; the train had a headlight which she noticed as it reached the crossing and passed, but she did not hear it blow until it got to the crossing, and did not know whether the bell was ringing; did not notice any one on the track. The testimony of Mrs. Rayburn was to the same effect.

The plaintiff also introduced Lonnie Bodine, who testified that he had been a locomotive engineer for about twenty years, was acquainted with the operation of locomotives, and of air brakes with which the defendant's train was equipped. He stated that he saw Carson Bond in the vicinity of the railroad, going toward the restaurant where a crowd of people were congregated, shortly before the train came in; he himself being at the corner drug store. Upon hearing of the accident to Mr. Bond witness went to the spot, 50 or 60 feet south of the crossing—said he did not know the exact distance, it could be 50 or 60 yards—where he found him lying near the end of the ties, still alive. He was picked up and carried to the drug store. The witness afterwards helped the un-

dertaker to undress the body, and observed the injuries testified to; also, that on the clothing and body of Mr. Bond was black oil or grease, such as is used on the engine and nowhere else. He stated that the train blew when it was down below the switch, and again when the trucks were approaching the Pine street crossing; that the track is straight for about 400 steps south of the crossing; that a train such as this, properly fitted with air brakes, when running six miles an hour, can stop within 12 feet, but if running 25 miles an hour would require from 100 to 150 feet.

With this proof plaintiff rested, and the defendant offered Paul Knight, postal clerk at Wiggins, who testified that he remembered the arrival of the train on the evening of December 24, 1936, at which time he was standing a little north of the depot, two or three feet from the track, with a mail sack; that his attention was first directed to the train by its light as it came around the curve; that there was nothing to obstruct his view as he watched it approach the crossing; that there was nobody on the track, except a couple of men who were crossing the street—no one on the track south of the crossing; that the train as usual blew by the switch, about 250 yards south of the crossing, but he did not remember the number of times, nor did he remember the ringing of the bell. The witness testified that he was watching the train, and that no one was struck on the crossing—he first heard of the accident about twenty-five or thirty minutes later.

The defendant introduced E. S. Smith, a resident of Wiggins for twenty-eight years—not connected with the defendant in any way. He testified that he saw the deceased, with Bourbon Hughes, a short time before the train came in; that he had gone across the track to the drug store when he heard the train blow at the section house, about a quarter of a mile from the depot, whereupon he and Mr. Simpson turned back to the depot, stop-

ping on the east side just north of Pine street; that as the train came in it blew four times, but he was not certain whether the bell was ringing. He testified that he looked down the tracks, but saw no one on it. The train stopped at the usual place, and was pulling out when the witness heard that some one had been killed. Going to the place of the accident he found Mr. Bond on the west side of the track, about 107½ feet from the south side of Pine street, according to measurements made with a steel tape. Hughes was lying 26 feet to the south of Bond, the latter about 52 feet from the corner of the restaurant.

The defendant introduced J. A. Simpson, a resident of Wiggins for thirty-five years, who had been to the restaurant before the train came in, going from there to the drug store with Mr. Smith. Hearing the train blow somewhere about the curve a quarter of a mile away, he walked back to the railroad, and when the train came in was between the Pine street crossing and the corner of the depot on the east side of the track, arriving at that point before the train reached the station—it was about half way between the curve and the station. The headlight was burning, and witness heard the regular four whistles of the engine, but did not remember whether the bell was ringing; and saw no one between him and the headlight, nor any person on the track. The witness thought the train was a few minutes late, and when it pulled out he heard that somebody had been killed, but too late to notify the train crew. He immediately went to the scene of the accident, and found Bond lying thirteen or fourteen feet north of the corner of the warehouse, four or five feet from the end of the ties, on the west side of the track, and Hughes lying twenty-six feet further south. The witness chopped the corner of the ties to identify the place. By measurement the distance from where Carson Bond was lying to the south side of Pine street crossing was found to be one hundred

and seven or eight feet, and fifty-two feet to the corner of the restaurant. A side track on the west side of the main line runs close to the warehouse, within four or five feet, and the ground here is covered with Bermuda grass.

The next witness offered by the defendant was John Garner, who was in Wiggins when the accident occurred. He had seen Mr. Bond about 6 o'clock, in company with Bourbon Hughes and Pat Loper on the railroad crossing, and they seemed to be drinking a little. He saw them when they came out of the restaurant and turned south, at which time the train was heard blowing below the curve; this was the last time he paid attention to the train. He was on the east side of the track, on his way to the drug store, and did not know the men had been hurt until the train was gone.

The defendant offered Joe Cuevas, who had been a conductor on the line since 1900, and was in charge of the train when it reached Wiggins about 6:30 o'clock, some five minutes late, on the evening of December 24, 1936. The train consisted of three baggage cars and three coaches, pulled by a large passenger type locomotive equipped with an electric headlight, standard brass bell weighing 100 pounds, and a steam whistle which could be heard about a mile under ordinary conditions; as they came into Wiggins two station signals were given; the first when about a quarter of a mile away, and continuously from that time until the crossing was reached, blowing a long, two shorts, and a long. He did not remember about the ringing of the bell. The train stopped about two cars south of the crossing, but the witness knew nothing of the accident until after his train had left.

W. J. Castenado, flagman on the train. testified as to the make-up of the train. Coming into Wiggins he was riding on the front end of the day coach, the second car from the rear. He testified that crossing signals were

sounded, beginning at the curve about a quarter of a mile away, and continued until the crossing was reached; that the train was running at a speed of ten or fifteen miles an hour; that all equipment was in good condition; the train had an electric headlight and a bell operated by air, so that when the air was turned on the bell continued to ring until the valve was shut off—the witness could not hear the bell from his position on the train. He first learned of the accident on reaching Bond, but got no definite information concerning it until he arrived at Hattiesburg.

The next witness for the defendant, Charlie Powell, colored train porter, testified that as the train came into Wiggins he was in the negro coach next to the baggage car; heard the crossing signal, was near enough to the engine to hear the bell, got off when the train stopped, while the bell was still ringing; but knew nothing at the time of any one having been injured.

The next witness for the defendant, George Roach, colored fireman on the train, testified as to the equipment of the train, confirming what was said by other witnesses; he was sitting in the train window on the seat of the locomotive, where he had been since leaving the section house; that as they came into Wiggins the road crossing signal was given as well as the station signal, beginning at the first south switch, and continuing until the crossing was reached. The automatic bell was turned on a mile down the track by the valve at the side of the engineer, and continued to ring until the train was passing out of town after having stopped at the station. He testified that the train was running at a speed of about ten miles an hour, and the witness, sitting on his seat box, looked up the track and saw no one on it, in front of or close to the engine, but did see people on the crossing on one side or the other, going to the restaurant.

The defendant next introduced Charles Anglin, engineer on the train, who had served in that capacity since

1925. He testified that they left Gulfport about 5:30, arriving at Wiggins about 6:30; that the electric headlight was turned on before leaving Gulfport; that the bell was an air-ringing device, turned on by means of a valve located in front of the engineer, and being turned on it continued to ring until the valve was closed; that the engine was equipped with a steam whistle which could be heard a mile or more when in good condition; that as the train came into Wiggins he blew the station signal to the south of the south switch, and before reaching the Pine street crossing he blew the road crossing signal when more than eleven hundred feet south of the crossing continuously until the engine passed the crossing; that the bell was ringing, having been turned on before he began to blow the crossing signal, and not shut off until the train was leaving Wiggins; that he was looking out for the crossing ahead as the train drew into the town, and did not see anybody on the track, although the light from the headlight was bright, but did see some people at the crossing before the train reached that point; that the train was running about fifteen miles an hour, and he was applying his brakes as it came into the station, stopping at the usual place; that he did not know any one was hurt until after the train left Bond, the station beyond Wiggins. He further testified that black oil was not used on engines—had not been for about two years, alemite being used instead—but on the coaches.

The next witness introduced by the defendant was Guy Rayburn, who testified that he had known Bond and Hughes all their lives, saw them in Wiggins about ten minutes before the train came in on the evening of December 24, 1936, at the railroad crossing, between the restaurant and the drug store. That they said to him, "Let's go to Hattiesburg," and on his refusing tried to get him to go; they told him they were to "blind" the train to Hattiesburg—they did not say how, and the last he saw of them they were going toward the restaurant.

It will be observed from reading the testimony of the various witnesses that it is conflicting. Section 6130, Code of 1930, provides as follows: "Any railroad company having the right of way may run locomotives and cars by steam through cities, towns and villages, at the rate of six miles an hour and no more; and the company shall be liable for any damages or injury which may be sustained by any one from such locomotive or cars whilst they are running at a greater speed than six miles an hour through any city, town or village. The railroad commission shall have power to fix and prescribe limits in cities, towns and villages in which railroad companies may run locomotives and cars by steam at a greater rate than six miles an hour, and whenever it shall have fixed and prescribed such limits in any city, town or village this section shall not thereafter apply to the running of cars and locomotives by steam within the same."

The testimony shows beyond dispute that the train was moving at a speed of from ten to twenty-five miles an hour. Several witnesses estimated the speed to be twenty-five miles an hour, while the engineer in charge of the train testified that it was going about fifteen miles an hour; and as there was no effort to show that any greater rate of speed than six miles an hour had been allowed by the Railroad Commission, it is not contended that there was any such order.

The court peremptorily instructed the jury for the defendant that there could be no recovery on account of the failure to give signals; and also that although they may have believed from the evidence that the defendant's train was traveling at a greater speed than six miles an hour at the point where the deceased, Carson Bond, was injured, yet they cannot find a verdict for the plaintiff in this case unless they further believe that speed of the train was in itself the direct and proximate cause of the injury received by him. The court instructed for the plaintiff that if the jury believed from the preponder-

ance of the evidence that Bond was killed by defendant's passenger train on the evening of December 24, 1936, at a point or place within the incorporated town of Wiggins, Miss., and, further, that at the time he was struck by the train the said Carson Bond was standing, sitting, or walking on the main line track, of the defendant, at a place where the employees of the train could and did see him, or should have seen him if keeping a proper lookout on entering a much frequented place used by the general public, without blowing the danger signal, or making any effort to avoid striking him, then they would find a verdict for the plaintiff, and assess such damages as they believed from the evidence that the plaintiffs had sustained by reason of the wrongful killing of their husband and father, if they believed from the evidence that such killing was the result of negligence in the operation of the train on the part of the defendant's employees.

The court also instructed the jury for the plaintiff that even though they believed from the evidence that the proximate cause of Bond's death was the negligent operation of the train by defendant's employees, and should award plaintiffs damages for such death, yet they should reduce the damages so awarded to plaintiffs in proportion to the degree of negligence on the part of the deceased, as shown by the evidence in the case, to have been a contributing cause of his death.

The court instructed the jury for the defendant that: "If you believe from the evidence in this case that Carson Bond, at the time he lost his life, was attempting to board defendant's train at a time and place where passengers are not invited to board trains, and for the purpose of going to Hattiesburg, then you should return a verdict for the defendant."

The court also instructed the jury for the defendant that the persons in charge of the train are entitled to assume that an apparently normal person walking, standing, or sitting on or near a railroad track in plain view

of an approaching train in the night, with its headlight burning, will move from the place of danger, and the engineer is under no duty to stop or slacken the speed of the train until it becomes reasonably apparent to him in the exercise of ordinary care, that such person is not going to step aside from the dangerous place.

The court peremptorily instructed the jury for the defendant that the locomotive on the occasion in question was equipped with a bell and whistle of the size and quality required by law; and also that the purpose of ringing the bell and blowing the whistle continuously for a distance of 300 yards before reaching or passing over a public crossing is to give notice to persons at or near crossings, intending to pass over it; but that the failure either to ring the bell or blow the whistle, if the jury should believe there was such failure, would not entitle the plaintiffs to recover, if the deceased saw the train, and by the use of ordinary care could have avoided injury.

The jury in the case could find from the evidence, and apparently did so find, that the deceased and Hughes were walking down the track just prior to the accident, and that the train was approaching at an excessive rate of speed; that the deceased undertook to step from the track to a place of safety, but misjudged the speed of the train, and was struck by it before reaching a safe place. The statute above quoted, prohibiting the running of trains at more than six miles an hour within incorporated municipalities, was designed to prevent injuries to persons which a greater speed might cause, and to enable the crew operating the train to come to a stop, if necessary, within a short distance, to avoid injuring or killing persons who might be within reach of the train coming into, or operated in, such municipality. It was, of course, negligence to violate this statute, and the jury could find, as it apparently did, that the speed of

the train in excess of six miles an hour was the contributing, proximate cause of the death.

Under section 511, Code of 1930, contributory negligence is not a bar to recovery. It reads as follows: "In all actions hereafter brought for personal injuries, or where such injuries have resulted in death, or for injury to property, the fact that the person injured, or the owner of the property, or person having control over the property may have been guilty of contributory negligence shall not bar a recovery, but damages shall be diminished by the jury in proportion to the amount of negligence attributable to the person injured, or the owner of the property, or the person having control over the property.'"

Prior to the enactment of this section the defendant would have been entitled to a peremptory instruction; but because of the policy established by this section, and by the six-mile statute, it was negligence on the part of the defendant to operate the train within the limits of the municipality at a greater rate of speed than six miles an hour; and if such negligence proximately caused, or contributed to, the death of deceased, although he may have been guilty of gross negligence, this would not prevent recovery under section 511, Code of 1930, above quoted.

The jury were instructed for the plaintiff to diminish the damages, if they found the railroad company's employees to have been negligent, in proportion to the negligence of the deceased.

In our judgment the jury were warranted in finding, as they did as shown by their verdict, that the company was negligent in operating its train at a speed in excess of six miles an hour; and that such negligence directly and proximately contributed to the death of Carson Bond. It is well known to experienced persons that it is difficult to estimate with any accuracy the speed at which an approaching vehicle may be traveling, if it be coming directly toward one. The deceased, although a tres-

passer on the defendant's track, could assume that the person operating the train was traveling at the speed required by law. Furthermore, if the deceased was traveling down the track, and was seen by the engineer, who knew he was traveling at an excessive rate of speed, he should have slowed down to the lawful rate of speed, and given the alarm to avoid injury to the person on the track, if possible. It is quite probable that had the train been operating at the lawful rate of six miles an hour, the deceased would have reached a place of safety in time to avoid being struck. Also, the testimony shows that people frequently congregated in and around the depot, and the cafe; and the jury were warranted in believing that the defendant was aware of this, and of a condition in which prudence would require the observance of the six-mile limit by an approaching train.

We are of the opinion that the jury were warranted in finding liability on the part of the defendant; but that in assessing damages they did not deduct enough because of the contributory negligence of the deceased. The negligence of the deceased was greater than the negligence of the railroad company; and the statute imposing the duty of diminishing damages should be observed by juries in rendering verdict. While the jury are authorized to find facts, they are under the duty to exercise proper caution and diligence, and to observe the rights of both parties to the litigation, and to make a fair reduction in case both parties were negligent; so giving due effect to the statute, as they were instructed to do in this case. The court dislikes to disturb the finding of a jury, especially in cases where persons are seriously maimed or killed, and where the lives of others may be seriously affected as a result, and suffering caused; nevertheless, the duty rests upon the court, as one of its solemn obligations, to see that each party to a litigation has a fair trial, and that the jury, in the ex-

ercise of its functions, gives due attention to the instructions on the law submitted by the trial judge.

After a careful and full consideration, we are of the opinion that the verdict should not have exceeded $7,500, on the facts in this record, and that any judgment in excess of that amount is not supported by law and evidence, and would cease to be compensation for injuries, and become spoliation.

If within ten days from the rendition of this decision the plaintiff will enter a remittitur of the amount above $7,500, and costs in the court below, the judgment will be affirmed; otherwise, it will be reversed and remanded.

Affirmed, with remittitur.

**Anderson, J.**, delivered opinion of the court on motion.

The motion is sustained to the extent that the judgment shall bear interest from the date of is rendition in this court, and is overruled as to the costs of the trial in the court below.

The language in the last paragraph of the opinion, 179 So. 355, 362, "and costs in the court below" was inserted through inadvertence—it was not intended.

Sustained in part; overruled in part.