ILLINOIS CENTRAL RAILROAD COMPANY *v.* SANDERS, EXECUTRIX

No. 40266          November 5, 1956          90 So. 2d 366

*Jones & Stratton,* Brookhaven; *Byrd, Wise & Smith,* Jackson, for appellant.

*Wm. D. Carmichael,* Crystal Springs; *Henley, Jones & Woodliff,* Hazlehurst, for appellee.

144

McGehee, C. J.

On February 10, 1955, at 6:30 A.M., Eli W. Sanders, 73 years of age, was struck and killed by a northbound freight train of the defendant Illinois Central Railroad Company at the Georgetown Street crossing, running east and west, in the City of Crystal Springs, Mississippi. Immediately prior to the accident Sanders had come out of a cafe located on the south side of Georgetown Street and approximately 250 feet east of the railroad tracks, had gotten into his pickup truck and driven the same in a westerly direction to where he came to a complete stop near the house-track and was then proceeding across the northbound main track, which was the east track of the double track system there, when he was struck by the northbound freight train which consisted of 77 loaded cars and 11 empty ones. The precise point or distance from this track to where he came to the complete stop before undertaking to cross is not definitely stated in the testimony introduced on the trial of this case, except that he stopped "where people ordinarily stopped" before undertaking to cross.

Mr. Sanders came out of the cafe with T. B. Sullivan, who followed him in his own car to the crossing, after first cleaning off the dew from the windshield thereof. Therefore Sanders arrived at the crossing first and was seen by Sullivan to be looking up the railroad track toward the north, from which direction the Panama Limited was almost then due to arrive. Sullivan did not see Sanders look toward the south, from which direction the freight train was approaching, but the fair import of his testimony is that Sanders could have looked to the south before this witness saw him looking to the north, since

Sanders arrived at the crossing shortly before Sullivan did.

While Sullivan was driving behind Sanders and approaching the crossing he saw the freight train approaching by looking between a vegetable packing shed and the north end of the depot, both on the south side of the crossing and east of the northbound main track, but he expressed it as his opinion that it was unlikely that Sanders could see the approaching northbound freight train from where the latter was at the time the former saw the same. Sullivan and Stokes Lingle were the only eyewitnesses to the accident who testified in the case except A. R. Lansing, the defendant engineer, who testified that he was about 100 feet from the crossing when he saw Sanders undertake to cross the east or northbound main line of the railroad track, and who also testified that the cowcatcher of his locomotive engine was approximately 50 feet of Sanders when he first saw him.

The engineer further testified that he had blown the whistle two longs, a short and another long, south of the crossing and that the bell which was operated by air was ringing for the distance required by statute and was still ringing when the engine came to a stop, which was shown to be approximately 2,000 feet north of the crossing. At that time the rear cars of the train had the crossing blocked.

Sullivan testified that he did not hear a whistle blow or the bell ring, but further stated that he was hard of hearing in the left ear and that since it was in February and cold he had his car windows up. Stokes Lingle, who was approaching the crossing from the west side of the tracks and traveling east, testified that he had the windows of his car up, that the car heater was making noise, and that the first thing that attracted his attention was the headlight of this northbond freight train and the automatic flashing signals, the signals being located within about 10 feet of the west main track and

ahead of him at the time. It was then getting "good daylight". He came to a sudden stop and saw Sanders and recognized him before the latter started across the east main line track after having first come to a complete stop before attempting to cross the same. He did not hear the whistle blowing or the bell ringing, but did not testify that these signals were not actually given. He said that when the locomotive struck the Sanders truck it had almost gotten across the east main track. He did not say whether or not Sanders looked to the south before attempting to cross the track.

Sanders and his truck were knocked approximately 100 feet north of the crossing. Lingle left his car and went to the place where the Sanders truck was found between the tracks of the west main line on which the southbound Panama Limited was almost then due to arrive. It was necessary to send ahead and flag the Panama Limited to stop. Lingle found that Sanders was rendered unconscious by the impact of the collision, and he never regained consciousness.

A southbound freight train had crossed the crossing and had gone into a passing track about 1,000 feet to the south to let the Panama Limited pass. No member of either of these freight train crews testified in the case as to the signals except the engineer on the northbound freight train involved in the collision.

The engineer testified that he was going about 30 miles per hour when he approached the crossing; that it could have been a little more or slightly less than 30 miles per hour. He was corroborated on this point by Lingle, but Lingle testified that he was not a good judge of the speed of a train. Sullivan also testified that he was not a judge of the speed of a train but that it was going fast.

One or two witnesses testified for the plaintiff that the train was going from 40 to 50 miles an hour, and another testified that it was going between 50 and 60 miles per

hour. The Railroad Company's records disclosed that it had traveled from Brookhaven to Crystal Springs, a distance of 30 or 31 miles, in 43 minutes, or an average of 45 miles per hour.

There is no substantial conflict in the testimony in regard to the fact that the automatic flashing signals were in operation at the time Sanders went onto the track, but the one on the east side of the track was at least 40 feet from the track on which the train struck the Sanders truck, and if he was very close to this track when he started to move on across the crossing, then the automatic flashing signal would have been behind him at that time. From where Sullivan was he could see both of these automatic signals flashing at the time he saw the train approaching from the south. There was a sign on each of them which read "Stop on Red Signal". Lingle could have seen the sign as he approached it from the west side of the crossing, but it was not shown that the one on the east side of the crossing was between Sanders and the east main line at the time he undertook to cross the same. But doubtless it was operating when he passed it.

The proof, as disclosed by photographs and by the testimony of witnesses, shows that on the east side of the railroad tracks, and alongside of the same, there was a long vegetable packing shed in close proximity to the crossing; that the shed, about 20 feet wide and 20 feet high, extended to the south; that south of this long packing shed and in close proximity thereto was the depot building; that there were two boxcars on the housetrack west of the packing shed and between the shed and the east or northbound main line. Sullivan testified that the north end of these two boxcars was from 10 to 20 feet south of the crossing and a witness Conn also testified on behalf of the plaintiff that they were about 3 feet from the north end of the platform of the packing shed. The railroad station agent testified that when he left

work at 5 P. M. on February 9, and when he returned to work at 7:30 the next morning these boxcars were further south and a distance of 95 feet from the north end of the shed. Boyce Ferguson, the city marshal, testified that they were so located when he measured the distance with a steel tape at about 7:30 A.M. February 10th.

It was the duty of the station agent, according to his testimony and as required by Rule 1129 of the Company, to make a written report as to the initials, numbers and location of any boxcars at or near the crossing, following an accident where a person or property has been injured or damaged. He testified that he made such a report. A motion to require its production was sustained, but the record fails to show that it was introduced in evidence. There was some testimony to the effect that these cars could have been moved by hand after the accident and before the photographs were taken at approximately the hour of 10 A.M. on February 10, 1955; that this could be done by two or three men and the use of a pincher bar.

■■ ■ It was for the consideration of the jury as to whether or not following this tragedy at 6:30 A.M. on February 10th any person or persons would have attempted to move these boxcars between the time of the accident and the time the photographs were taken. The jury may have thought it not unreasonable or improbable that some interested person or persons could have moved these cars during this period of time following the accident after many people would likely have ceased to view the scene, and not be observing the operations in the railroad yard for a very long period of time after the accident occurred.

■■ ■ If these boxcars were where Sullivan and Conn said they were at the time Sanders drove his truck onto the track, the jury could have readily believed that they were near enough the crossing to have obstructed Sanders' view of the oncoming freight train to the south. On the other hand, if they were located 95 feet below the

north end of the vegetable packing shed at 7:30 A.M. and had not been moved after the accident, as contended for by the Railroad Company, we are nevertheless unable to say that as a matter of law the negligence of Sanders in going upon the track without looking south, if he did fail to look south, was the sole proximate cause of the accident. The conflict in the testimony as to the speed of the train and as to the giving of statutory signals, when considered in connection with the alleged obstruction of the view of Sanders by the packing shed, by the depot building, and by the two boxcars along the west side of the packing shed, tending to show that he could not have seen the train until it had approached so near him that he was in the act of crossing the track before he could have seen the same by the exercise of reasonable care under all of the circumstances, presented an issue of fact for the jury as to whether or not the negligence of the Railroad Company was a concurring or contributing cause of the accident.

It is true that it was clearly shown that the automatic flashing signals located on each side of the tracks at the crossing were in operation at the time of the accident, but when it is considered that the one on the east side was 40 feet from the track (and which the jury could have believed from the evidence was behind Sanders when he stopped his truck and then started it up again) together with the fact that the testimony of the witnesses for the plaintiff was to the effect that the automatic flashing signals and bell or gong were frequently in operation when there was no train presently approaching the crossing, there was presented to the jury the further issue of determining to what extent the decedent was negligent under the unusual situation confronting him.

It is to be conceded that the Railroad Company had the right to locate its depot and vegetable packing shed where they are now located, but the situation required that the Railroad Company should meet the peril thus created with precautions commensurate with the resulting danger

to those using this crossing. Georgetown Street is the main business thoroughfare east and west in the city of Crystal Springs. It forms a link in State Highway 27 from Tylertown through Monticello, Georgetown, Crystal Springs, Utica and on to Vicksburg. Approximately 3,000 motor vehicles pass over the crossing daily, and the proof further discloses that at about 6:30 A.M. on the morning of this tragedy the train that killed Sanders was an extra northbound freight train and that another freight train had just passed over the crossing and gone into a "Passing track" below the crossing so as to let the southbound Panama Limited pass. While Sanders was familiar with the crossing, since he resided in Crystal Springs east of the railroad and operated a cattle farm on the west side thereof for a number of years, he was nevertheless confronted with an unusual situation with the northbound extra freight train approaching the crossing from beyond the packing shed, depot, and the two boxcars as he was approaching the crossing and looking northward for the oncoming of the southbound Panama Limited. We think that the case was peculiarly one for the determination of the jury in view of the conflicting testimony as to the speed of the train involved in the accident, the fact as to whether or not the automatic flashing signals and bell necessarily indicated the immediate approach of a train to the crossing, and as to whether or not the statutory signals were given.

It is true that the engineer, according to his undisputed testimony, was too close to stop the train in time to avoid striking the Sanders truck after he first saw it attempting to cross the northbound main track, and that Lingle testified that the train was within about 100 feet of the crossing when he saw Sanders start across the track, and that although Lingle's view was unobstructed from the west side of the track he did not see the train until it was too close to have stopped in time to avoid the accident. It is also true that according to the proof it would have

required from 1½ to 2 seconds to have applied the emergency brake, and that it would have required from 6 to 9 seconds for the brakes to take effect fully throughout the train, and at a time when it was running about 30 miles per hour, according to the testimony of both the engineer and Lingle, or 44 feet per second. But these facts are not controlling under the situation presented by the other proof in the case.

In the case of G. M. & O. R. Co. v. Scott, 216 Miss. 532, 62 So. 2d 878, the Court quoted with approval the statement contained in 44 Am. Jur. page 747, Railroads, Par. 507, as follows: "The principle that if a crossing is unusually dangerous, ordinary care requires the railroad company to meet the peril with unusual precautions, is particularly applicable where the dangerous condition results from the obstructions to the view which prevent a traveler from seeing an approaching train until he is dangerously close to the track. In such a case, the railroad company has the duty of exercising caution commensurate with the situation to avoid collisions with travelers on the highway, as by a less amount of speed, or by increased warnings, or otherwise, or, if an unslackened speed is desirable, by keeping a watchman on duty, or some other sufficient means of warning travelers, such as gates or other safety devices." In that case the court further said: "The engineer could not see the approaching taxi, and the driver of the taxi could not see the approaching train because the view of each was obstructed. * * *" The verdict of the jury imposing liability upon the railroad company was therein upheld.

In the case of Donald v. G. M. & O. R. Co., 220 Miss. 714, 71 So. 2d 776, the Court said: "It was undisputed that the operatives of the northbound train could not see an automobile approaching the crossing from the west until it was very close to, or practically on, the tracks. It was likewise undisputed that the driver of such automobile could not see southward until he was very close,

or within 8 or 10 feet of the tracks." And again quoted with approval the statement in 44 Am. Jur., Railroads, par. 507, page 747, and further stated that the same had been recognized and approved in the previous cases of N. O. & N. E. R. Co. v. Lewis, 214 Miss. 163, 58 So. 2d 486, and G. M. & O. R. Co. v. Scott, supra. See also G. M. & O. R. Co. v. Golden, 221 Miss. 253, 72 So. 2d 446, wherein the Court stated: "There was also a conflict in the testimony relating to the obstructions along the west side of the railroad track looking southwardly from the Hickory Street crossing, which might have prevented a traveler from seeing an approaching train, until he was dangerously close to the track, and which might have prevented the members of the train crew from seeing an automobile approaching the crossing, until the engine was dangerously close to the crossing. The plaintiff's contention was that these obstructions were such as to require the exercise of unusual precautions by the members of the train crew to meet the dangerous conditions resulting from such obstructions. All of these conflicts in the testimony presented issues of fact that were properly submitted to the jury." Citing numerous former decisions of this Court. See also L. & N. R. Co. v. Whisenant, 214 Miss. 241, 48 So. 2d 908, which is directly in point on the question of proximate cause.

The appellant cites and quotes from the cases of Billingsly v. I. C. R. Co., 100 Miss. 216, 56 So. 790, and Thompson v. Miss. Central R. Co., 175 Miss. 547, 166 So. 353, where the motorist had an unobstructed view of the approaching train, and also cites other decisions of this Court where the motorist actually saw the approaching train and was thereby thus informed both of its presence and of its proximity in time to avoid going upon the crossing, and other cases where the train was occupying the crossing at the time of the accident, and all of which cases hold that failure to give the statutory signals under such circumstances is immaterial, but, in our opinion,

such is not the situation presented by the testimony in the instant case.

However, the appellant then cites the case of Iler v. Seaboard Airline R. Co., 214 F. 2d 385 (USCA 5th Cir.), wherein the factual situation as to the automatic flashing signals and bell were in operation as in the instant case, and wherein liability of the railroad company was denied on the basis of a Georgia statute (Georgia Code Anno., Section 105-603) which provides: ''If the plaintiff by ordinary care could have avoided the consequences to himself caused by the defendant's negligence he is not entitled to recover.'' But Section 7776, Miss. Code of 1942, relating to the duty of the driver of motor vehicles to stop before crossing the railroad track, reads in part as follows: ''The violation of this section shall not of itself defeat recovery, and the question of negligence or the violation aforesaid shall be left to the jury.''

Moveover, in the Iler case the view of the motorist was unobstructed, and that case is otherwise distinguishable on its facts from the instant case. Then, too, Judge Borah, who wrote the opinion in the Iler case, referred therein to the decision of the Fifth Circuit in Atlantic Coastline R. Co. v. Key, 196 Fed. 2d 64, wherein the Court had said: ''From the testimony of some of the witnesses, the jury would have been authorized to find that a peach packing shed, in which was stored various articles, together with the topography of the location, rendered it impossible to see the train approaching until one was within a very short distance of the track. * * *

''We conclude that in the circumstances of this case the evidence presents issues of fact as to the extent of negligence of the parties, so it cannot be said as a matter of law that the defendant was in no wise negligent. The question was for the jury to determine. * *

''It is only in the rare case where the evidence demands a finding that the plaintiff was, or in the exercise of due care should have been, aware of the approaching

train that further progress in crossing the track may in itself be held a bar to recovery. In all other instances, the question is one for the jury to determine under all the circumstances whether the attempt to cross the track without stopping or looking or listening is a failure to observe ordinary care. Atlanta & West Point R. Co. v. Gilbert, 82 Ga. App. 244, 246, 60 E. E. 2d 787.''

Numerous other cases are cited and quoted from in the brief of the appellee which we think support the view that the fact that an automatic flashing signal and bell are in operation at a crossing at the time a motorist attempts to cross the same is not of itself sufficient to require the trial court to hold as a matter of law that the failure of the motorist to heed such warning renders his act the sole proximate cause of the accident complained of.

The appellant assigns as error an instruction granted to the plaintiff, but the argument as to alleged error in giving the instruction is predicated upon the theory that there was no proof to support a contention that the negligence of the decedent was not the sole proximate cause of his death. The effect of the argument is that the railroad company was entitled to a directed verdict.

But it is argued by the appellant that since the trial court rejected the appellee's theory of an entrapment of Sanders by the confusion created by the flashing of the signals and the sounding of the bell thereon at times when no train was then approaching the crossing, and there was no cross assignment of errors as to the court's ruling in that behalf, we are precluded from considering the testimony of the several witnesses for the plaintiff on that point. However, the court did not exclude this testimony but allowed it all to go to the jury in connection with the proof as to the obstructions, etc., on the issue of whether or not Sanders exercised the care of a reasonably prudent man on the occasion in question. We think

that the jury was entitled to consider all of this testimony on that issue.

The court also refused certain instructions to the plaintiff to the effect that the crossing was an unusually dangerous one, and there is no cross assignment of error by the appellee as to the refusal of those instructions. Nevertheless, the jury was authorized to consider the issue of fact as to whether the railroad company was negligent in operating its train at the rate of speed that the jury may have believed from the conflicting evidence that it was operated on the occasion of this accident.

The remaining question in the case is whether or not the $25,000 verdict rendered for the plaintiff who sued under the wrongful death statute for damages on behalf of the estate of the deceased for the benefit of herself and on behalf of her married daughter, Mrs. Hilda Sanders Bishop of Yazoo City, Mississippi, on account of the death of E. W. Sanders, is so excessive as to evince bias, passion or prejudice on the part of the jury.

The plaintiff in her declaration alleged that the life expectancy of her husband, E. W. Sanders, was 7.64 years on February 10, 1955, which was his 73rd birthday. She introduced mortality tables to prove that he had a life expectancy of 7.64 years, as alleged in her declaration. She further proved that he was in good health, a man of good habits, and was leading a very active life; and that he would probably have lived for a period of time longer than the life expectancy of the average man of 73 years of age.

■■ ■ The earning capacity of the decedent for five years immediately prior to his death was shown by certified copies of his income tax returns for those years to be the net average of $3,265.42 per annum; and it has been held under a statute similar to our own that living expenses of a decedent are not a deductible item in determining the value of the life expectancy to the decedent. See annotation in 163 A. L. R. 256. The earning capacity

of a man is what he is capable of earning and is not what he is capable of saving. Edith May Mickel v. New England Coal & Coke Co., 132 Conn. 671, 47 A. 2d 187, 171 A. L. R. 1001.

■■ ■ The plaintiff was entitled to recover damages for loss of companionship, protection and society. She was 67 years of age and had a life expectancy of 10.48 years, and their married daughter was 47 years of age and had a life expectancy of 23.65 years. In Gulf Refining Co. v. Miller, 153 Miss. 741, 121 So. 482, the Court held that when it comes to estimating damages for the loss of companionship and society of a decedent "the matter is largely one for a jury, unless the verdict evinces passion and prejudice. This Court must not apply its own judgment, but accept the verdict of the jury." Likewise in the case of Goodyear Yellow Pine Lumber Co. v. Anderson, 171 Miss. 530, 157 So. 700, the Court held that the amount to be recovered for loss of the companionship, protection, and support of a decedent is for the jury.

■■■ As to the value of the life expectancy of the decedent, the case of Gulf Transport v. Allen, 209 Miss. 206, 46 So. 2d 436, and the cases therein cited do not justify our holding that the verdict in this case is so excessive as to evince bias, passion or prejudice on the part of the jury, and especially when in the verdict there is added to the value of the life expectancy in this case a compensation for loss of companionship, protection and society, the value of which was peculiarly for the determination of the jury. None of the 12 jurors seemed to have thought that the amount awarded as damages to the plaintiff was excessive, and the judgment of the trial court in declining to set the verdict aside as being so excessive as to evince passion and prejudice is entitled to serious consideration at our hands. The jury was instructed as to its authority to consider any negligence on the part of the decedent in mitigation of the damages that it may

have otherwise thought the plaintiff was entitled to recover. We must assume that the jury gave proper consideration to all of the factors relating to any negligence of the decedent as compared to that of the defendant.

We have concluded that no error was committed by either the court or the jury that would justify a reversal of the case, and that therefore the judgment appealed from must be affirmed.

Affirmed.

*Hall, Kyle, Holmes* and *Gillespie,* JJ., concur.