ILLINOIS CENTRAL RAILROAD COMPANY, et al. v. NELSON

No. 42395          November 5, 1962          146 So. 2d 69

January 21, 1963                    148 So. 2d 712

*Wise, Smith & Carter,* Jackson; *John W. Freels, W. F. Cerne, Joseph H. Wright,* Chicago, Ill., for appellant, Illinois Central Railroad.

399

*Forrest B. Jackson,* Jackson, for appellants, Standard Oil Company and C. H. Weathersby.

· *B. D. Statham,* Magnolia, for appellee.

GILLESPIE, J.

The heirs of Percy Nelson, deceased, brought a wrongful death action against the Illinois Central Railroad Company, herein called Railroad, Standard Oil Company, herein called Standard, and C. H. Weathersby. Chancery jurisdiction was acquired because of attachment features of the case. Judgment for $150,000 was

rendered against all defendants, who appealed to this Court.

In view of the general finding of the lower court in favor of appellees, the facts are stated in the light most favorable to appellees, which means that all evidence favorable to appellees is taken as true, together with all reasonable inferences that may be drawn therefrom.

Percy Nelson died as the result of a collision between the northbound train of the Railroad known as the "City of New Orleans" and an eastbound tank truck driven by one Pigott. The truck was owned by C. H. Weathersby. The tank attached to the truck and the petroleum products therein were owned by Standard. The collision occurred at the intersection of the northbound main line track and Magnolia Street in the Town of Magnolia, Mississippi. Magnolia is the county seat of Pike County, with a population of about 2,000. There are two principal streets crossing the railroad inside of Magnolia, one of which is the Bay Street crossing, which is also a local highway. At Bay Street there are signals and gates to protect traffic from entering on the tracks when a train is coming. There are no such devices at the Magnolia Street crossing. The Magnolia Street crossing is one block north of Bay Street. Magnolia Street crossing is immediately north of the depot, which is situated on the east side of the northbound main line track. The depot bay window is about 17½ feet east of the northbound main line track. The Magnolia Street crossing is heavily traveled and the depot agent customarily stood at the crossing to flag traffic when the northbound City of New Orleans passed through the town in the morning. This was not a part of the depot agent's duties. The regular depot agent was not on duty and the extra agent did not flag on the morning when the accident occurred in which Percy Nelson was killed.

On the west side of the railroad between Bay Street and Magnolia Street there are certain evergreen trees

and one oak tree situated on railroad property. These trees are located in a parkway between West Railroad Street and the two main lines of the railroad. These trees, except the oak, were in foliage on the day Nelson was killed. The leaves of these trees reached to within about six feet of the ground and the trees extended toward the railroad tracks at varying distances. When a traveler approached the railroad going east on Magnolia Street, the view to the south was obstructed until the driver was within 29 feet of the southbound main line track. The stop sign is located 50 feet west of the southbound main line.

January 17, 1961 was a cold, clear day. The fatal accident occurred at about 8:50 A.M. on that day. The City of New Orleans consisted of two diesel locomotives and nine cars. The train weighed 1,835,340 pounds. The train approached the Magnolia Street crossing it began giving the statutory signals about 3,000 feet south of the crossing and continued to give signals until it collided with the truck. The train was traveling about 80 miles an hour and the brakes of the train were not applied until after it collided with the truck. The truck, driven by Pigott, approached the crossing from the west, traveling on Magnolia Street. There was a pick-up truck stopped at the railroad stop sign 50 feet west of the southbound main line. The Standard Oil Company truck passed the other truck and continued onto the tracks at a speed of 15 to 25 miles per hour and entered onto the tracks without stopping as required by statute. The rear wheels of the truck cleared the northbound main line track a few inches and the train struck the rear end of the tank and frame of the truck. The tank was ripped off the truck and the gas therein and the tank was hurled in a northeasterly direction. There was an immediate explosion. A short time later, after the train had proceeded a distance of several hundred feet, there was another explosion on the engine of the train but the

fuel tanks on the train did not explode. The deceased, Percy Nelson, was forman of a crew unloading grain from a box car which was located northeast of the point of impact. Gasoline was sprayed over the body of Nelson and he caught fire. He ran north with his clothes and his hair burning. Bystanders caught him and put out the flames and removed his clothing. Nelson was taken to a local hospital, and later was removed to the University Hospital in Jackson, where he died the 14th day following the accident.

The train's emergency brake system was applied by the engineer sometime immediately after the impact, and the train was stopped about a half mile north of the crossing. The engineer and fireman were killed. Eight people including Nelson died as result of the wreck.

Numerous questions are argued by the several parties, some of which do not warrant discussion.

■■ ■ The Railroad contends it was not guilty of any negligence contributing to the fatal occurrence, and argues that as a matter of law the case should be reversed and judgment entered here in favor of the Railroad. The Railroad was charged with numerous acts of negligence. We consider only one. It was charged that the Railroad was operating its train at a dangerous, reckless, and negligent rate of speed. We are of the opinion that the trial court was fully justified in finding that the speed of the train under the circumstances was negligence proximately contributing to the collision and death of Percy Nelson, deceased. The fact that the depot agent usually flagged traffic when the City of New Orleans came through was competent to show that because of the high speed of the train under the circumstances it was peculiarly dangerous for people to cross when it was approaching. The driver of the Standard Oil truck had never been flagged and presumably did not rely on any such custom. The speed of the train,

coupled with the obstructions on both east and west sides of the crossing, justified the finding of negligence. It was not speed alone nor the obstructions alone, but the speed under the circumstances that justified the finding of negligence on the part of the Railroad. The driver of the Standard truck was required by statute to stop and look at a distance of not less than ten nor more than fifty feet from the nearest track. This Court has said that this presupposes that the railroad company will not so obstruct the view at the crossing that the driver of a vehicle will not see the train if he complies with the statute. While it appears from the evidence that Pigott, driver of the Standard truck, did not stop as the law required, he could have looked and not seen the train because of the trees. Our cases have pointed out that under such circumstances the giving of statutory signals does not always exhaust the duty of the railroad. The Magnolia Street crossing may be a safe crossing if the train is operated at slower speed, but a finding was justified that it was negligent to operate the train across the Magnolia Street crossing at 80 miles per hour without a watchman or other means of warning travelers. G. M. & O. Railroad Co. v. Golden, 221 Miss. 253, 72 So. 2d 446; I. C. Railroad Co. v. Sanders, 229 Miss. 139, 90 So. 2d 366; N. O. & N. E. Railroad Co. v. Lewis, 214 Miss. 263, 58 So. 2d 486.

The negligence of Pigott, driver of the Standard truck, was overwhelmingly established. He violated Sections 7776 and 8211(a), Mississippi Code of 1942. He failed to keep a proper lookout. He was familiar with the crossing. The chancellor was fully justified in finding Pigott guilty of negligence. Any finding to the contrary would be manifestly wrong.

Weathersby and Standard argue that Pigott was the agent and employee of Weathersby only, and that Standard was not responsible for Pigott's negligence. Weathersby operated under a "Limited Agency

Agreement".with Standard and as such operated a bulk plant at McComb for the distribution of Standard products in Pike and Amite Counties. Standard owned the bulk plant property consisting of several buildings under a sign bearing the words "Standard Oil Company." Standard paid the taxes on the bulk plant·property and owned all the petroleum products kept at the bulk plant and which were delivered in the truck involved in the wreck. Weathersby owned the truck but Standard owned the tank thereon. The petroleum products were invoiced in Standard's name. The accessories sold by Weathersby were his property. The truck was hauling property for both Standard and Weathersby at the time of the accident. The driver was on his way to deliver petroleum products owned by Standard. Standard promulgated the rules for the operation of the bulk plant and the conduct of the truck drivers. Weathersby hired and paid Pigott.

It is clear from the evidence that both Weathersby and Standard had the right to control Pigott and that he was the servant of both, and at the time of the accident was engaged in carrying out the business of both. It follows that the chancellor was justified in entering judgment against both Weathersby and Standard.

Finally, all of the defendants contend that the amount of the award is so excessive that a remittitur should be ordered. This is the most serious question presented. The deceased was guilty of no contributory negligence and the award of damages was for compensatory damages only. No exemplary damages are involved.

The deceased was 50 years old and had a life expectancy of 21.37 years. He was survived by three adult daughters who were not dependeht upon him, his widow, age 43, who was partially dependent, and a four-year old son who was totally dependent. The record established that the family was close and bound by affection, respect and devotion. The deceased was an· electrician

by trade but was employed as a mill foreman at $65 per week. His total earnings for the year preceding his death was $2980 and the present value of his anticipated life income, commuted at 3%, is $28,800. Total medical and other outlay of money was $2,467.97. The deceased received burns over 64% of his body; 50% of his body sustained first degree burns. His hair and clothing were on fire when he fled from the scene of the accident. He was caught and the flames extinguished and he was sent to the local hospital. Shortly thereafter he was transferred to the University Hospital at Jackson, Mississippi, and was under the treatment of Dr. Artz, an expert in the treatment of burns. Some of his flesh sloughed away in the course of changing bandages. Deceased suffered for forty-eight hours from thirst and could be given no water during that time. Physicians could not give morphine, but he was given heavy doses of tranquilizers and barbiturates. Deceased suffered greatly, both physically and emotionally. He lived for fourteen days and was conscious most of the time, although there was part of the time in his latter days when he was unconscious.

It is obvious from the foregoing statement that approximately $120,000 of the award was for pain and suffering and loss of society and companionship. This Court recognizes that loss of human life can never be fully compensated, nor is there any yardstick by which to measure compensation for pain and suffering and loss of society and companionship.

We have carefully reviewed the cases cited by the parties on the question of damages. The cases are helpful only as general guides, for in the matter of damages each case must be reviewed on the basis of the particular facts involved, including the age of the deceased in a wrongful death action, his life expectancy, his anticipated earnings, the intensity and duration of suffering, the relationship between the deceased and his

survivors, and matters of dependency. ██ █ When this Court reviews the amount of damages it is important that two considerations be kept in mind. The law has placed in the hands of the jury the matter of measuring damages in cases tried in circuit court, and this Court may not rightfully substitute its judgment for that of the jury; and this Court will not disturb the jury verdict unless it evidences passion, prejudice, or bias. In cases tried in chancery court, the rule is the same except that the test is whether the amount of the verdict is manifestly wrong. ██ █ The second important consideration is that when the amount of the verdict, when fairly and impartially reviewed, evidences passion, prejudice, or bias, or when the award of the chancellor is manifestly wrong, it is the duty of this Court to reverse or order a remittitur. The duty and power of the court in this respect has been recognized and exercised throughout its history. ██ █ We have carefully considered the present case in the light of the foregoing considerations, and in view of the age of the deceased, his earning power, and the other elements of damage, and have concluded that the judgment is excessive by $35,000, and that an award by the chancellor of $150,000 is manifestly wrong. Accordingly, if appellees will remit $35,000 within fifteen days from this date the judgment will be affirmed for $115,000; otherwise the cause will be reversed and remanded for trial on the issue of damages only. While we concur on a remittitur of $35,000, some of the judges would prefer a lesser amount, while others would prefer a larger remittitur.

Affirmed with remittitur.

All Justices concur, except Arrington and Jones, JJ., who took no part.

## ON MOTION TO CORRECT JUDGMENT

GILLESPIE, J.

In this case the lower court rendered judgment for wrongful death in the amount of $150,000. This Court, in its original opinion, affirmed the case on liability and on the question of damages provided appellees entered a remittitur for $35,000. The remittitur was duly entered and the judgment was thereupon affirmed in the amount of $115,000.

The motion to correct judgment and the response thereto raise questions involving costs, statutory five percent penalty, and the matter of interest.

■■ On the question of costs, Sec. 1989, Code of 1942, provides that under these circumstances this Court may adjudge the costs as may seem proper. The costs below, of course, will be adjudged against appellants. We are of the opinion that it would be proper to assess the appeal costs one-half to appellants and one-half to appellees. Shipman v. Lovelace, 215 Miss. 141, 60 So. 2d 559; Ford v. Commercial Securities Co., 220 Miss. 157, 70 So. 2d 525.

■■ Appellants are not taxable with the five percent damages levied under Sec. 1971, Code of 1942. The five percent penalty is taxed only where the judgment of the court below is affirmed unconditionally. Ford v. Commercial Securities Co., supra; Shipman v. Lovelace, supra.

■■ Appellants contend that the judgment in this case should bear interest from the date of the judgment of this Court entered after the remittitur was filed by appellees. Appellees contend that the judgment should bear interest from its date in the lower court. Appellants rely on Aetna Life Ins. Co. v. Thomas, 166 Miss. 53, 144 So. 50, but we are of the opinion that this case is not in point because as to interest the issue was resolved on the ground of waiver. Grice v. Central Elec-

tric Power Assn., 230 Miss. 437, 92 So. 2d 837, is not controlling for the reason that judgment was never entered in the court below and the plaintiffs never obtained judgment until reversal of the lower court and the entry of the judgment here.

The case of Gulf & S. I. R. Co. v. Bond, 181 Miss. 254, 179 So. 355, is directly in point. Judgment for wrongful death was entered for plaintiffs in the lower court for the sum of $10,000. This Court conditionally affirmed if plaintiffs would enter a remittitur of $2500. Remittitur was entered and this Court, on motion, held that the judgment should bear interest from the date of final judgment in this Court.

Appellees rely on Grillis v. Patrick, 214 Miss. 747, 59 So. 2d 341, wherein personal injuries were awarded plaintiff by judgment of the lower court. Defendant appealed and this Court affirmed on liability and conditionally affirmed provided plaintiff would enter a remittitur of $250.00. And the opinion in that case stated: "If the remittitur is entered in this Court, the affirmance for $2700 will bear interest from July 24, 1951, the date of the original judgment." See also Miss. State Highway Com. v. Rogers, 242 Miss. 439, 136 So. 2d 216.

Appellees also rely on I. C. R. R. Co. v. George, 241 Miss. 233, 130 So. 2d 260. In that case damages were awarded for injuries to land in the sum of $1727.25. The lower court also entered an injunction. Defendant appealed to this Court and this Court affirmed the damages in full but reversed as to the injunction and provided that the decree for damages should bear interest from the date of the decree in the trial court. The *George* case is not in point because there was no conditional affirmance of the judgment for damages.

The cases of Grillis v. Patrick, supra, and Miss. State Highway Com. v. Rogers, supra, on the one hand, and Gulf & S. I. R. Co. v. Bond, supra, on the other hand, are directly in conflict and cannot be reconciled.

Sec. 39, Miss. Code of 1942, is as follows: ''All judgments and decrees founded on any contract, shall bear interest, after the rate of the debt on which the judgment or decree was rendered. All other judgments and decrees shall bear interest at the rate of six per centum per annum.''

At common law judgments do not bear interest. Code Sec. 39 provides that all judgments shall bear interest, those founded on contract after the rate of the debt on which the judgment is rendered, and all others at six per centum. If the suit had been on a note instead of tort the judgment would have borne interest after the rate of the note, and upon reduction of the judgment in this Court by remittitur in lieu of reversal, the plaintiff would have been entitled to collect interest from date of the judgment in the trial court. The statute makes no distinction between a judgment founded on a contract and one based on a tort except as to the rate of interest. It follows that when a judgment based on a tort is reduced in this Court by remittitur in lieu of reversal, the judgment bears interest from its date in the trial court at the statutory rate of six per centum. The statute does not permit any other conclusion. Gulf & S. I. R. Co. v. Bond, 181 Miss. 254, 179 So. 355, is hereby overruled insofar as it conflicts with this decision.

The judgment of this Court shall be corrected as herein indicated.

Motion to correct judgment sustained in part and overruled in part.

All Justices concur, except Arrington and Jones, JJ., who took no part.