464 So.2d 47 (1984)
Talmadge STUBBLEFIELD
v.
JESCO, INC., et al.
No. 54242.
Supreme Court of Mississippi.
September 26, 1984.
Rehearing Denied November 14, 1984.
As Modified December 19, 1984.
On Petition for Rehearing February 27, 1985.
*48 William S. Lawson, Tupelo, for appellant.
William M. Beasley, W.P. Mitchell, Mitchell, Eskridge, Voge, Clayton & Beasley, Tupelo, Darden, Sumners, Carter & Trout, New Albany, for appellees.
En Banc.
DAN M. LEE, Justice, for the Court:
This is an appeal from the Circuit Court of Lee County wherein the appellant, Talmadge Stubblefield, was awarded a jury verdict of $1.2 million dollars. That jury had determined that the negligence of the appellee, Jesco, Inc., was the proximate cause of injuries sustained by Stubblefield in a grain mill explosion in Tupelo on December 22, 1977. The circuit judge sustained a motion by Jesco to enter a judgment notwithstanding the verdict and Stubblefield now appeals the granting of that motion. In addition, Jesco has cross-appealed and assigns the following error:
(1) The Court erred in admitting into evidence the testimony of the witness John Sims.
(2) The verdict of the jury is contrary to the overwhelming weight of the evidence.
(3) The Court erred in not granting a new trial on the issue of damages when the amount of damages awarded by the jury was so excessive as to evince bias, passion and prejudice on the part of the jury.
*49 For the reasons set forth below, we reverse the granting of the judgment notwithstanding the verdict and affirm on cross-appeal.

THE FACTS
A substantial portion of the evidence presented at trial is uncontradicted. The design and operation of the Sunshine Grain Mill, the nature and extent of Stubblefield's injuries, and the general nature of the work Jesco was performing on the day of the explosion are without dispute. As to the remaining operative facts our standard of review when a judgment notwithstanding the verdict has been entered requires that we view the evidence most favorable to Stubblefield and grant him the benefit of all favorable inferences which may reasonably be drawn from the evidence.
Talmadge Stubblefield worked as an expander operator for Sunshine Grain mills since 1969. Sunshine manufactured dried, processed dog food. The manufacturing complex consisted of a four story concrete mill building, a number of smaller metal buildings, and several grain elevators used to store wheat, corn and soybeans. Conveyor belts connected the elevators with the fourth floor of the mill building. Once grain was transported by means of the conveyor belts to the fourth floor it was there subjected to a system of hammermills which ground or pulverized the grain to a fine dust. The third floor of the building consisted primarily of the sides of large grain bins through which the pulverized grain dropped and where it was stored until it was removed on the second floor of the building at the bottom of these bins. From there the grain passed through a series of screens designed to separate it by size. Grain was then transported by means of auger screws to the first floor where it was processed through the expanders, dried and packaged, then loaded for shipping. Each floor of the building was connected by a stairwell and a manlift. Talmadge Stubblefield operated a grain expander on the first floor of the mill building. The expander room was located in the middle of the first floor. Sunshine Mill employees were stationed only on the first floor of the building.
As an expander operator, Stubblefield earned $12,821 in 1977. At the time of the explosion he was married and had two children. Prior to his injuries he enjoyed fishing, hunting, gardening and tinkering with electronics.
On December 22, 1977 Talmadge Stubblefield's life was permanently and tragically changed as a result of an explosion and fire at the mill. It is undisputed that on the date of the explosion there was in effect a City of Tupelo ordinance, designed as a fire prevention code, which regulated activities such as welding. It is this code which formed the basis of Stubblefield's allegations of negligence by Jesco that proximately caused his injury. Jesco had been hired as an independent contractor to make certain modifications to the mill. These modifications necessarily involved welding and cutting, both with an arc welder and acetylene torches.
Talmadge Stubblefield arrived at work at approximately 6:45 the morning of the explosion. At 7:00 o'clock he relieved the night shift, and between 7:30 and 7:45 his foreman asked him to go with Johnny Whitehead to clean out the wheat bin. Stubblefield and Whitehead went to the fourth floor of the grain mill building, the floor of which served as the top of the grain storage bins. Located in the floor were manhole covers which opened directly into the grain storage bins. Stubblefield and Whitehead climbed down into the wheat bin with a drop light and began to scrape clumps of wheat dust from the walls of the bin. These clumps fell to the bottom of the bin which was located on the second floor. Stubblefield testified that he and Whitehead cleaned the bin to the satisfaction of the Jesco welders. The purpose of cleaning out the bin was so that the Jesco employees could modify the grain bins by welding an additional grain chute onto the bottom of them at the second floor. Because he and Whitehead knew *50 that the Jesco welders would have to cut a hole in the bottom of the bin in order to perform their task, Stubblefield and Whitehead decided to remove the clumps of grain which had fallen to the bottom of the bin through that hole.
Once Stubblefield and Whitehead had finished cleaning the walls of the bin they returned to the second floor and watched the Jesco welders use an acetylene torch to cut three sides of a rectangle in the bottom of the bin. After cutting the three sides of the rectangle, the Jesco workers used a crowbar to bend the metal along the fourth side so that they could reach in and remove the chunks of grain. All of the large chunks of grain were removed from the bottom of the bin. Stubblefield and Whitehead then went back to the fourth floor, gathered their tools and used an air hose to blow the grain dust off of them. Stubblefield then returned to the control panel in the expander control room. Stubblefield testified that while he watched the welder cut the hole in the bottom of the wheat bin he did not see or smell any smoke. After the welding was completed, Tommy May, a Jesco welder, told Stubblefield to tell Stubblefield's foreman to turn the wheat line on.
As Stubblefield stood facing the control panel, he heard a noise from behind. He testified that after hearing the noise he came to three months later in the intensive care unit in a hospital in Greenville. The time between the completion of the welding and the explosion is uncertain; however, it was not less than fifteen minutes nor more than an hour. Somewhere between three hundred fifty pounds to six tons of wheat had been run through the wheat bin before the explosion.
Stubblefield testified that he had seen the Jesco welders set up their equipment and begin welding. He stated that the welders had not swept the area in a circumference of thirty-five feet from the point of the welding. Nor had they wet down the area or the wheat bin or posted a fire guard. All of these omissions were in violation of the Tupelo City ordinance regulating welding.
The force of the explosion was so great that it literally destroyed the four story grain mill building. Frank Stubblefield, plant superintendent, was in the plant parking lot at the time of the explosion. He testified that he heard two explosions. Simultaneously he saw the third and fourth floor walls of the grain mill building blow out. After the explosion he toured the building and noted that the sheet metal walls separating the wheat bin on which the Jesco workers had been welding from a corn bin was buckled in towards the corn bin. The bins were arranged in groups of four in the shape of a square. Each bin represented a quadrant in the square. Although the bins were separated by sheet metal walls, there was an opening at the top of each of them which allowed ventilation or circulation from one bin to another. Frank Stubblefield testified that the corn bin was completely blown out and that the manhole covers on the fourth floor to these bins were blown off. The corn bins had suffered greater damage than the wheat bins and the bulk of the damage done to the bins was on the third floor.
Both Frank Stubblefield and Willie McClendan, a maintenance foreman for Sunshine Mills, testified that the morning of the explosion they had checked the bonding wires used in electrical junction boxes throughout the plant and found that these wires, were all intact. After the explosion McClendan and Stubblefield toured the plant and re-examined the wires. They performed an ohm meter test which indicated that a current was still running through these wires, negating the possibility that the wires were unconnected at the time of the explosion.
Talmadge Stubblefield's injuries, disfigurement and the attendant pain he continues to suffer are the manifestations of this great human tragedy. Stubblefield was burned on up to 60% of his body, including his face, neck, arms, chest, back and legs. Indeed, Dr. Robert Love, a plastic surgeon at the Greenville Burn Unit who has continued *51 to treat Stubblefield since the time of his injuries, testified that Stubblefield was the most severely injured patient he had ever seen live. When Stubblefield arrived at the hospital he was in shock but conscious. He lost consciousness after several days and remained unconscious for a period of thirty days. Because of the nature of his injuries and in order to prevent infection, Stubblefield was given painful baths twice a day. These baths and a treatment known as debridement, the removal of dead skin with either a surgical sponge or by peeling it off, were so painful that it caused Stubblefield to pass out. Stubblefield received this treatment at least twice a day during his three hundred day stay in the hospital. He has received numerous grafting operations, a tracheostomy, perineal urethroplasty and urethal fistulectomy. Dr. Love indicated that the skin grafts were as painful as a number of Stubblefield's burns because they required that skin be removed from portions of his body where it was left, thereby creating a new open sore. Stubblefield suffered from what was known as swan neck deformity and burn scar contractures. This resulted in his neck being drawn down to his chin. The treatment for this condition is to pull his neck back and tear loose the skin under the neck which pulls his skin down. This procedure occurred twice a day while he was in the hospital. Stubblefield has also permanently lost all of his sweat glands, save those under his arms. Because of this Stubblefield is not able to tolerate heat very well and tires easily. Dr. Love testified that Stubblefield would not be able to work any job more than approximately three hours at a time, and certainly no job where he was subject to getting hot. Stubblefield has lost all ability for sexual performance, and the ability to dispose of bodily waste in a normal fashion. He is unable to sleep, is easily frightened by sudden noises and flashes, still in constant pain, subject to constant itching, and must wear Jobst gloves in order to retard scar tissue on his hands. He has been hospitalized ten times since the explosion and undergone twenty separate operations. In addition, Dr. Love testified that he would probably continue to treat Stubblefield for an additional five years and that he could easily have medical bills of $1,000.00 per year. Dr. Love was also of the opinion that there was a good possibility that Stubblefield would be subjected to future hospitalization. In his opinion Stubblefield had a permanent disability to 75% of his body. Stubblefield's medical bills prior to trial, totaled $126,690.30.
Margaret Allen, a registered nurse and former employee of the Greenville Burn Unit, testified that she was working at the burn unit during the time Talmadge Stubblefield was a patient there. She further corroborated the testimony of Stubblefield and Dr. Love regarding the extent of his injuries.
Dr. Jan T. Goff, a psychiatrist, testified that he had seen Talmadge Stubblefield in a professional capacity for approximately seven months. He stated that he was suffering from depression and fear of a fire or explosion. He had a complete loss of sexual appetite, he overate, suffered from insomnia, had nightmares and is at times suicidal. He further testified that depression is brought on by what is known as a stresser. The stresser in this case was the explosion and heinous injuries suffered by Stubblefield. In his opinion, this was at or near the highest level of stresser which he described as being catastrophic. He stated that Stubblefield's condition required psychiatric treatment but that it was difficult to prescribe the anti-depressant drugs that Stubblefield needed because these drugs affected his ability to tolerate heat and subjected him to heat strokes because of his inability to sweat. He further testified that during the period of time he had been seeing Stubblefield he reflected an increased susceptibility to irritability. He stated that in his opinion his prognosis was that Stubblefield's condition would worsen. He indicated that Stubblefield's condition was deteriorating and would continue to do so. He stated that he was going to require further psychiatric treatment and medicines *52 which would cost on an average of $5,000 per year.
Two employees of Jesco were called to further substantiate Stubblefield's claim that it was Jesco's negligence which caused the explosion and his injuries.
Gray Megginson, a Vice-President of Jesco, Inc., testified that although Jesco required some special experience of welders before allowing them to work in a grain mill, he did not require proof of this special experience if the welders identified themselves as welders. Megginson admitted that the Jesco supervisor was not present at the time of the explosion as he was supervising two jobs at once and was then at the second job in Red Bay, Alabama. Megginson was unaware of the City of Tupelo ordinance regulating safety procedures for welding conducted within the city. He stated he did not know if the Jesco welders working at the Sunshine Mills plant were aware of the Tupelo ordinance.
Larry Hamilton, the Jesco foreman in charge of the welders at the time of the explosion, explained the procedure for cutting holes in the storage bins and then welding chutes to these holes through which the grain was to fall to an auger screw trough. Hamilton testified that his men swept the area around the wheat bin but not for the required distance of thirty-five feet. Hamilton also admitted that his men had not wet down the area, used asbestos shields to prevent the spread of hot slag, nor had they set up a fire watch inside the bin for the purpose of detecting hazardous errant slag. Hamilton was not aware of the National Fire Safety Code, the Standard Fire Prevention Code or the Tupelo ordinance which required that these measures be taken prior to welding in a grain mill. Hamilton never looked inside the bin nor had he given his welders any special instructions concerning welding in a grain mill. He testified that the only employees on or above the second floor of the grain mill building the morning of the explosion were Johnny Whitehead and Talmadge Stubblefield. Hamilton admitted that he had not inspected the wheat bin after Whitehead and Stubblefield finished cleaning it. He further testified that Jerry Thompson, a Jesco employee, was using a cutting torch just before the explosion and that Thompson was not a certified welder. He did however, deny that Thompson was doing anything unsafe at the time he was using the cutting torch. Hamilton stated that following the Jesco workers completion of the job he inspected the welding and saw no flaws or "blow throughs." Once Sunshine Mills began running wheat through the bin again, he stated that he lifted the gate or door from the wheat bin to the chute his men had just attached and that wheat came down the chute indicating that the level of wheat had risen above the point at which his men were working. Hamilton admitted that the use of an aceytlene torch sprays hot metal BBs in a wide area.

THE EXPERTS
Stubblefield's proof as to causation, the essential link between negligence and recovery of damages, came through the testimony of his expert witness, John E. Sims. Sims is a consulting engineer who had spent eight years in accident investigation. Twenty-five to thirty percent of his accident investigation experience had been with fire and explosion investigations but this was the first time he had participated in the investigation of a grain mill explosion.
Sims testified that he had not toured the grain facility prior to the time it had been rebuilt after the explosion. He had studied the OSHA report, depositions, drawings of the plant and over one hundred photographs. He stated that these were sufficient to allow him to familiarize himself with the plant's condition after the explosion. As a former design engineer, he was familiar with all of the types of machinery in the mill. Sims was also familiar with the minimum standards set by the National Fire Prevention Association and the Tupelo city ordinance which was taken from the National Fire Prevention Association Code *53 No. 61-C, §§ 1009-1098. Sims stated that in his opinion the Sunshine Mill explosion was exactly the problem addressed by § 61-C of the National Fire Prevention Association Code Standard for prevention of fire and dust explosions in feed mills. A hypothetical question was then propounded to Sims. This hypothetical, having been worked out by the parties and the judge, attempted to include all uncontroverted evidence and exclude points in controversy. Sims was allowed to base his opinion only upon facts and exhibits in evidence. With this predicate Sims stated that it was his opinion that the most probable cause of the explosion was a sequence of events which occurred as follows: It was impossible for the Jesco welders to have cut into the bin without causing molten slag or BBs to be thrown about both inside and outside the bin. One or more of these molten BBs became lodged in some grain which was caked to the inside wall of the bin. The molten slag caused the grain to smolder, a process which Sims testified was capable of continuing for hours. The point at which the ember lodged could have been above the second floor ceiling but was not necessarily so. Once the welding was over and the hammermill was reactivated ground wheat dumped into the wheat bin. When there was the proper mixture of falling wheat and air, the smoldering ember ignited causing the first explosion. This first explosion bowed the common wall of the wheat and corn bins in towards the corn bin and knocked the manhole cover off of the wheat bin. It further caused additional grain dust to be knocked loose around the facility and a flame front ensued which was further fed by the grain dust throughout the plant and the second explosion then occurred. Sims stated that he had considered other causes of the explosion and that there could be one thousand possible theories but that this was the most probable and that the evidence very strongly indicate that he was correct.
In an attempt to rebut Sims' testimony, Jesco called Kirk Rosenhan, a professional engineer and teacher at Mississippi State University. Rosenhan testified that he had investigated the site the day after the explosion. He subsequently returned three times. Rosenhan was of the opinion that the initial explosion had not occurred in the wheat bin because "it would have been blown to smithereens." He also stated that he saw no evidence of a smoldering fire inside the wheat bin. Rosenhan then detailed a number of structural or equipment deficiencies and dangers in the mill. Among these were the wrong type of electric switches, dirty electrical switches, light switches which were capable of producing sparks, electrical appliances not rated for hazardous areas, an electric drill being used by McCaulley Electric workers, tramp metal, ball bearings, frayed wires, and loose bonding wires. Rosenhan stated that he was of the opinion that static electricity had caused the blast. On cross-examination he admitted that he had been hired to find the cause of the explosion but had not been able to do so. Rosenhan admitted that he had not done an ohm meter test on the bonding wires and that there was no evidence that the electrical appliances which he had complained of as being unsafe, had caused the explosion. He did however state that in his opinion welding was not involved.
Keith Royer, the head of Fire Service Education at Iowa State University was also called as an expert witness for Jesco. Royer was not an engineer. He testified that he disagreed with Sims as to Sims' theory on the cause of the explosion. Royer stated that there was not enough structural damage done to the wheat bin to indicate that the initial explosion had occurred there. Royer agreed with Rosenhan that the blast was caused by static electricity. Royer was of the opinion that the initial explosion occurred on the fourth floor and then traveled down the building and back to the top where it blew up. Royer admitted that in a treatise or publication on grain mill explosions he had written that the main known cause of grain mill explosions is welding. He also admitted that static electricity had never been known to cause an explosion at a grain *54 mill. Royer did add that the cause of a number of grain mill explosions is unknown. Royer agreed with Sims that sparks can come from welding and lodge in cakes of grain dust where they will smolder for hours.
Following all of the above testimony, the jury deliberated for an hour and one-half and returned a verdict finding Jesco guilty of negligence which was the proximate cause of Talmadge Stubblefield's injuries. They assessed Stubblefield's damages at 1.2 million dollars. A judgment was entered on May 26, 1981 in accord with the jury's verdict. On January 27, 1982, the circuit judge entered an order sustaining Jesco's motion for a judgment notwithstanding the verdict.

THE LAW
The initial inquiry on this appeal is whether the trial judge was correct in sustaining the motion for a judgment notwithstanding the verdict. In his ruling on the motion, the trial judge stated that the testimony of Sims was not sufficient on which to support the verdict because it amounted to assumption stacked upon assumption and was therefore only a possible explanation of the explosion, not a probable one. In numerous cases, this Court has set forth a standard of review regarding a j.n.o.v. That rule, as expressed and summarized recently in Justice Robertson's special concurring opinion in Jesco, Inc. v. Whitehead, 451 So.2d 706 (Miss. 1984) is as follows:
The motion for j.n.o.v. tests the legal sufficiency of the evidence supporting the verdict. It asks the Court to hold, as a matter of law, that the verdict may not stand. Where a motion for j.n.o.v. has been made, the trial court must consider all of the evidence  not just evidence which supports the non-movant's case  in the light most favorable to the party opposed to the motion. The non-movant must also be given the benefit of all favorable inferences that may reasonably be drawn from the evidence. If the facts and inferences so considered point so overwhelmingly in favor of the movant that reasonable men could not have arrived at a contrary verdict, granting the motion is required. On the other hand, if there is substantial evidence opposed to the motion, that is, evidence of such quality and weight that reasonable and fairminded men in the exercise of impartial judgment might reach different conclusions, the motion should be denied and the jury's verdict allowed to stand. See, e.g., General Tire and Rubber Co. v. Darnell, 221 So.2d 104, 105 (Miss. 1969); Paymaster Oil Co. v. Mitchell, 319 So.2d 652, 657 (Miss. 1975); City of Jackson v. Locklar, 431 So.2d 475, 478 (Miss. 1983).
See also, Jesco v. Shannon, 451 So.2d 694 (Miss. 1984); Blackwell v. Dairymen, 369 So.2d 511 (Miss. 1979).
By addressing the facts of the instant case in the light most favorable to Talmadge Stubblefield, we arrive at the following conclusions: (1) Jesco admittedly had violated city ordinances pertaining to the safety precautions in welding: (2) there was caked on wheat inside the grain bin on which Jesco welders had been using an acetylene torch; (3) there was hot slag or BBs thrown into the grain bin at the time Jesco workers cut the hole at the bottom of the bin and also at the time they cut the fourth side to that hole; (4) there was grain dust throughout the building and the bin; (5) the area inside the bin was a contained area; (6) there was an explosion which bowed the walls of the wheat bin outward; (7) there were primary and secondary explosions. Considering these facts it is next necessary to ask what inferences must be drawn to support Sims' theory. The first inference is that one of the hot slag BBs came in contact with caked on wheat inside the bin causing the wheat to smolder. The second inference is that the smoldering wheat ignited when the proper mixture of air and grain dust became present inside the bin. The last inference is that this ignition set off the explosions which destroyed the plant and resulted in Talmadge Stubblefield's injuries. We cannot say that these inferences are "beyond the bounds of *55 legitimate conclusions." All inferences made after the initial one (that hot slag induced the smoldering of caked on grain) are certainly entirely reasonable. When the grain began to refill the wheat bin there was any number of combinations of dust, oxygen and air current present. Given the explosive nature of grain dust, once the smoldering grain erupted into flame it is most reasonable to infer that an explosion ensued. Given the first explosion, the ensuing explosions are also entirely reasonable inferences. Returning to the first inference, we cannot say that the inference that hot slag lodged in caked on wheat is beyond the bounds of reason. All of the witnesses, including witnesses both expert and non-expert for the plaintiff and the defense, testified that these hot slag BBs could travel a distance in excess of twenty-five feet. Indeed, the Tupelo city ordinance and the safety codes which Jesco admittedly violated required a thirty-five foot clearance. Therefore, given the caked on wheat found inside the bin, this inference is not too far fetched.
In two prior cases this Court has addressed damage suits arising from the December 22, 1977 explosion at the Sunshine Grain Mill. In Jesco v. Shannon, supra, and Jesco v. Whitehead, supra, we reached different but not irreconcilable conclusions. In Jesco v. Shannon we affirmed a jury verdict for Shannon. In that case, Shannon put on testimony, through his expert witness Emerson Venable. Venable's theory as to the cause of the explosion was similar to Sims' with the exception that Venable hypothesized that once the burning ember in the wheat bin caused the initial explosion, the subsequent explosion occurred because grain dust was drawn into one of the open flame gas dryers on the first floor of the mill.
In Jesco v. Whitehead, supra, we reversed a jury verdict for Gerald Whitehead and remanded for a new trial. In that case Whitehead presented two separate theories as to the cause of the explosion. In his case in chief, he presented the testimony of his expert witness Phillip Lawson who testified that the fire was caused by the negligence of Jesco welders in allowing their acetylene hoses to become ruptured. In rebuttal, Whitehead called Sims who gave an abbreviated explanation of his theory and whose testimony was primarily designed to defeat Jesco's assertion that the blast was sparked by static electricity. We there held that the proof presented by Whitehead was so nebulous that the circuit judge had abused his discretion in refusing to grant the motion for a new trial. It is essential that the distinction between the Whitehead case and the instant case be recognized. In Whitehead the issue dealt primarily with granting a new trial. In the instant case, we are concerned with a judgment notwithstanding the verdict. The standards of review are quite different. The entry of a judgment notwithstanding the verdict requires a much stricter standard and should therefore be less frequently availed of. It is only when a directed verdict at the close of the plaintiff's case and again at the close of the defendant's case, would have been proper that a judgment notwithstanding the verdict is proper. Such is not the standard where the trial court is required to use its discretion in granting a motion for a new trial. The variance in proof needed to support these motions is easily explained when one recognizes that a j.n.o.v. terminates the case, whereas a new trial simply gives both parties the opportunity to relitigate the controversy.
On this appeal we are concerned only with the sufficiency of the proof presented in the instant case. To quote one of the favorite expressions of the late Chief Justice Gillespie, "Each tub has got to stand on its own bottom." Nevertheless, in addressing the quality of Sims' theory of causation presented in the instant case, it is relevant to note that in the two previous cases this court remarked that the Sims theory once "fully developed" may well be sufficient upon which to base a verdict. In Jesco v. Whitehead, supra, Justice Robertson wrote:

*56 Second, we have the testimony of John Sims, a consulting engineer who was called in rebuttal by plaintiff. Sims was asked his opinion regarding the most likely place for the ignition to have occurred. Sims' answer was:
The most likely place would be in the wheat bin itself. As the ground wheat is falling out of the hammermill, the most likely place we are going to see explosive mixtures of air and wheat dust are in the wheat bin itself.
The problem here is that Plaintiff let the matter drop at this point. Mr. Sims never spells out just how, in his expert opinion, the explosion could have begun in the wheat bin. Accordingly, standing alone, Mr. Sims' theory (if we may call it that) is insufficient to sustain the verdict returned by the jury.
We thus have a second hypothesis, in and of itself too speculative and undeveloped to support the verdict, but nevertheless suggesting that Jesco is the culprit. Candidly, we regard the Sims "theory" as more sensible than that offered by P.J. Lawson. Indeed, if plaintiff had fully developed the Sims theory, it may well have been sufficient to sustain the verdict in his favor.
(Jesco, Inc. v. Whitehead, 451 So.2d 706 (Miss. 1984)).
In Jesco v. Shannon, in a concurring opinion authored by Justice Robertson in which Presiding Justice Walker joined, we find the following language:
In the case at bar what is in essence the "Sims theory" was fully developed. This was done primarily via the expert testimony offered by Plaintiff Shannon through Emerson Venable. Because of this substantial improvement and the quality of the expert proof offered by Plaintiff Shannon vis-a-vis that offered by Plaintiff Whitehead, I concur in the Shannon case that the Circuit Court correctly overruled Jesco's alternative motions for a judgment notwithstanding the verdict and for a new trial.
Based on the above discussion of the evidence and authorities, we hold that the circuit judge was in error by entering the judgment notwithstanding the verdict.

THE CROSS-APPEAL
On cross-appeal Jesco assigns as error the trial court's action in allowing the testimony of John Sims to be admitted into evidence. Jesco argues that Sims' testimony was inadmissible because it stated only a possibility, not a probability, that the explosion occurred as a result of the scenario he described. Jesco's contention is defeated by reference to Sims' testimony which Jesco's brief incompletely paraphrases. Sims testified that he considered a number of possibilities but that he ultimately concluded that the explosion originated in the wheat bin. "That's the most probable in my opinion. The most probable set of circumstances." Sims further testified that while he admitted that there were other possibilities, "We can't say with one hundred percent certainty, nor do we try to in coming up with the most probable set of circumstances... . All the evidence, in my opinion, points back to the wheat bin as being the location of the first explosion." Sims repeated his assertion that this theory was based on a probability and not a possibility several other times in the record. Therefore, this assignment of error is without merit.
Jesco's next assignment of error is that the verdict of the jury is against the overwhelming weight of the evidence. Jesco's main assertion here is that the photograph identified as Plaintiff's Exhibit No. 2 which Talmadge Stubblefield testified depicted the inside of the wheat bin could not possibly have been the wheat bin. Jesco asserts that when the picture is placed so that it corresponds with the directions Stubblefield testified to, "It is quite evident that there are no concrete walls on the north and west sides of the bin" as Stubblefield testified. From viewing the picture it is difficult to tell which of the walls are the concrete walls of the bin and which are metal. This is so because there is a great deal of grain caked on three sides of the bin. Talmadge Stubblefield testified that *57 he had been inside this bin countless times since he began working for Sunshine Mills in 1969. He was positive that Plaintiff's Exhibit 2 depicted the wheat bin in question because he recognized a broken step on the inside of that bin. The conflict in the evidence was a matter for the jury's determination. By viewing the photograph we are unable to say that it is obvious that the verdict of the jury was against the overwhelming weight of the evidence.
Under this assignment of error Jesco also asserts that the verdict was against the overwhelming weight of the evidence because Tommy May, a Jesco welder, did not smell or see any smoke after the three sides of the hole in the bottom of the bin had been cut. It must be remembered that this bin was two stories high and that smoke at the bottom of the bin would naturally rise to the top. Also, Tommy May admitted that he did not stick his head inside the hole at the bottom but only looked directly through the hole at the wall opposite him. Therefore, this assignment of error is also without merit.
Jesco's final assignment of error is that the verdict of the jury was so excessive as to evince bias, passion and prejudice. Having previously described the pain, disfiguration, humiliation and total change of lifestyle which have resulted from this horrific accident, we need go no further in holding that this assignment of error is wholly without merit. Furthermore this point was conceded by Jesco in oral argument.
Therefore, based on all of the foregoing, we hereby reinstate the original judgment of the circuit court wherein it ordered that the jury's verdict of 1.2 million dollars be assessed against Jesco in favor of Talmadge Stubblefield, and therefore the judgment of 1.2 million dollars, and cost, is hereby entered for Talmadge Stubblefield against Jesco, Inc.
REVERSED AND RENDERED.
PATTERSON, C.J., WALKER and ROY NOBLE LEE, P.JJ., and BOWLING, PRATHER and SULLIVAN, JJ., concur.
ROBERTSON, J., dissenting in part and concurring in part.
HAWKINS, J., not participating.
ROBERTSON, Justice, concurring in part, dissenting in part:
The procedural law of this state in effect at the time of the trial of this civil action absolutely afforded any litigant unsuccessful before a jury the right to file and have considered a motion for a new trial, provided only that he acts timely. I write separately because today's decision without reference to law or logic denies Jesco that important procedural right.
There is no question but that Jesco properly and timely asked the Circuit Court for a new trial. The practice of making the motion for a new trial contemporaneously with and as an alternative to a motion for judgment n.o.v. has been well established in our practice and long pre-dated the advent of the Mississippi Rules of Civil Procedure.
There is no question but that, had the Circuit Court back on January 27, 1982, denied the motion for judgment n.o.v., Jesco would have been absolutely entitled to present its motion for a new trial, to have same given plenary consideration and ruled upon.
Finally, there is no question but that Jesco has wholly preserved its rights under its alternative motion for a new trial before this Court. In its brief Jesco, as Appellee, urges that this Court, in the event we should hold (as we do) that the judgment n.o.v. was erroneously entered, order a new trial.
In this context, I concur in so much of the opinion of the Court as holds that the Circuit Court committed error when it granted judgment for Jesco, Inc. notwithstanding the verdict of the jury. The case ought not, however, be rendered here. We should remand to the Circuit Court for consideration of Jesco's alternative motion for a new trial.
The record before this Court reflects that on May 25, 1981, following the jury's verdict, *58 Jesco timely and properly moved the court for judgment n.o.v., or, in the alternative, for a new trial. Among the grounds cited in the motion were Jesco's charges that
(7) the verdict of the jury is contrary to the overwhelming weight of the evidence; [and]
* * * * * *
(9) the verdict of the jury is evinces bias, passion and prejudice on the part of the jury.
On January 27, 1982, the Circuit Court entered its order sustaining Jesco's motion for j.n.o.v. and entering judgment for Jesco and against Stubblefield notwithstanding the verdict of the jury. The Circuit Judge held that the evidence was insufficient as a matter of law to establish a causal connection between any negligence on the part of Jesco and the damages suffered by Stubblefield. The problem is that the alternative motion for a new trial has never been ruled upon by the Circuit Court. In light of today's decision, that motion likely will never be passed on by any court.
Where a party has moved for judgment n.o.v. or, in the alternative, for a new trial, and where the trial judge is of the opinion that judgment n.o.v. should be granted, and where the basis of that conclusion is the trial judge's opinion that the evidence is insufficient to support the verdict of the jury, it will ordinarily follow as a matter of course that the trial judge should couple his granting of the j.n.o.v. with the conditional grant of the motion for a new trial. Because less evidence favorable to the non-moving party is necessary to withstand a motion for j.n.o.v. than a motion for a new trial, if the trial judge believes the evidence so weak that j.n.o.v. should be granted, it will be a rare case indeed where he does not also regard that the verdict is against the overwhelming weight of the evidence, in which event he will order a new trial.
It is important here to keep in mind the nature and office of the motion for judgment notwithstanding the verdict as distinguished from the motion for a new trial. My views regarding this distinction have been noted in my concurring opinion in another case arising out of the same grain bin explosion as has generated this litigation. See Jesco, Inc. v. Whitehead, 451 So.2d 706, 711-717 (Miss. 1984). There is no reason to repeat that discussion here. Suffice it to say that the two motions  j.n.o.v. and new trial  are quite different procedural creatures. Where the party unsuccessful at the hands of the jury moves for both, he is entitled to a ruling on both. Here Jesco has never received a ruling on its motion for a new trial.
The reason why Jesco is now entitled to such a ruling will, I trust, be apparent from a consideration of the course of proceedings in this case.
Consider the matter from the point of view of the Circuit Judge immediately prior to his entry of judgment n.o.v. on January 27, 1982. If he were convinced that the evidence was insufficient to support the jury's conclusion that Jesco was liable so that j.n.o.v. should be granted, surely the verdict was against the overwhelming weight of the evidence and evinced bias, passion and prejudice on the part of the jury so that a new trial should also have been ordered. Put another way, if the only motion before the Court on January 27, 1982, had been a motion for a new trial made on the grounds that the verdict was against the overwhelming weight of the evidence and evinced bias, passion and prejudice on the part of the jury, it appears highly unlikely that the trial judge would have failed to grant that motion.
It would, of course, be impermissible for this Court to say how the trial Judge should have ruled on the alternative motion for a new trial. Such motions now as always are addressed to the sound discretion of the trial judge and should be passed upon by the trial judge in the first instance. What I say here is for the purpose of making clear that the procedural right the majority denies Jesco is no ephemeral right.
As the matter presently stands, Jesco is placed in what I regard as an intolerable *59 trick bag. Likely on January 27, 1982, Jesco was in a posture where the Circuit Judge would have set aside the verdict and granted a new trial had that been the only motion pending before the Court. Because Jesco went further and asked for judgment notwithstanding the verdict and because the Circuit Judge likewise went further and granted judgment notwithstanding the verdict, Jesco now finds itself deprived of a procedural right it timely and lawfully invoked and to which it may well have been entitled, and which it has in no way waived. This simply isn't fair.
In its brief filed December 20, 1982, in this Court, Jesco takes the alternative position that, even though this Court may conclude that the trial judge was in error in granting j.n.o.v., the case should be remanded to the Circuit Court for a new trial. This preserves fully Jesco's claim that it is entitled to a new trial, although it ignores the discretionary nature of a request for a new trial.
A motion for a new trial is addressed to the sound discretion of the trial court. Unmistakeably, this is not an unfettered discretion. That discretion should be exercised via consideration and weighing of a number of factors which I have set forth with some care in my concurring opinion in the Whitehead case. 451 So.2d at 715-716. On review we have authority to consider only whether the trial judge abused his discretion.
In this context, I would vacate the judgment entered in favor of Jesco, Inc. notwithstanding the verdict. I would further remand the case to the Circuit Court with instructions to take up and consider Jesco's alternative motion for a new trial. If on January 27, 1982, the Circuit Court had known of our view regarding Jesco's request for judgment notwithstanding the verdict, it would surely have overruled that motion and then proceeded immediately to take up and consider Jesco's alternative motion for a new trial. In view of our reversal of the j.n.o.v., the case in my view ought to revert to the posture it would have been in had the Circuit Judge back on January 27, 1982, overruled and denied Jesco's motion for j.n.o.v.
I fully realize that there has been a great deal of delay, expense and judicial inefficiency in what has occurred heretofore and the course I would follow, but this is not Jesco's fault. I assume we will not have this problem in the future for Rule 50(c), Miss.R.Civ.P. provides that where a j.n.o.v. is granted on grounds of insufficiency of the evidence the trial judge should go further and make a conditional ruling on the alternative motion for a new trial.
This latter practice has been frequently utilized in the federal courts which for years have operated under similar procedural rules. For example, see Planters Manufacturing Co. v. Protection Mutual Insurance Co., 244 F. Supp. 721, 728-729 (N.D.Miss. 1965) (ironically also a case involving a grain bin explosion) wherein the district court granted defendant's motion for judgment n.o.v. and further made a conditional grant of a new trial. On appeal, the United States Court of Appeals for the Fifth Circuit in Planters Manufacturing Co. v. Protection Mutual Insurance Co., 380 F.2d 869, 881 (5th Cir.1967) reversed the judgment of the district court insofar as it sustained the motion for j.n.o.v. but nevertheless affirmed the conditional new trial and remanded the case for a new trial. This practice is now clearly authorized in this state. Larkin v. Perry, 427 So.2d 138, 139 (Miss. 1983), although I regard that we have never had any prohibition on it.
For the future I urge a full consideration of the federal practice under Rule 50(c), F.R.Civ.P., see Montgomery Ward & Co. v. Duncan, 311 U.S. 243, 61 S.Ct. 189, 85 L.Ed. 147 (1940); 5A Moore's Federal Practice (2d ed. 1984) §§ 50.134-50.14; 9 Wright and Miller, Federal Practice and Procedure (1984 Supp.) §§ 2539-2540. We have made it clear that the federal practice should generally be our guide when considering questions arising under the Mississippi Rules of Civil Procedure. See Stringfellow v. Stringfellow, 451 So.2d 219, 221 *60 (Miss. 1984); Brown v. Credit Center, Inc., 444 So.2d 358, 364 fn. 1 (Miss. 1983).
Insofar as the majority opinion holds that the Circuit Court committed error in entering judgment in Jesco's favor notwithstanding the verdict of the jury, I concur. Insofar as that opinion reinstates the original judgment entered in Stubblefield's favor, following return of the jury's verdict, I respectfully dissent. In my view the case should now be remanded to the Circuit Court for plenary consideration of Jesco's motion for a new trial. Interest on the judgment is hereby assessed against Jesco, Inc., at the legal rate of 8% per annum from the date of the entry of the original judgment in this cause, May 26, 1981.

ON PETITION FOR REHEARING ON MOTION TO CLARIFY OPINION
ROY NOBLE LEE, Presiding Justice, for the Court:
The Circuit Court of Lee County entered judgment in favor of Talmadge F. Stubblefield for 1.2 million dollars on May 26, 1981, after a jury verdict in that amount, for personal injuries sustained by Stubblefield. Seven (7) months later, the circuit judge set aside that judgment and entered a JNOV in favor of Jesco, Inc., et al. [Jesco]. On September 26, 1984, this Court reversed and rendered the JNOV and reinstated the original judgment. Petition for rehearing by Jesco was denied.
Jesco paid the judgment in the sum of 1.2 million dollars, but declined to pay interest thereon. Thus, a controversy arose between Jesco, who claimed no interest was due, and Stubblefield, who contended that interest was due on the original judgment entered in the Circuit Court of Lee County on May 26, 1981, which amounts to $255,360. Stubblefield then filed a motion to clarify the opinion, and, on December 19, 1984, this Court, acting through Justice Dan Lee, entered the following order:
The Court, sitting en banc, being of the opinion that the Motion is well taken does hereby order that the Court's opinion in Talmadge F. Stubblefield v. Jesco, Inc., Et Al., 464 So.2d 47 (Miss., 1984) be modified so as to include the following at the end of the last paragraph:
Interest on the judgment is hereby assessed against Jesco, Inc., at the legal rate of 8% per annum from the date of the entry of the original judgment in this cause, May 26, 1981.
IT IS THEREFORE ORDERED that the Clerk of this Court cause the above described modification of the original opinion in this cause to be recorded with the Court's opinion in the Official Reporter of this Court's decisions.
Jesco contends (1) the decision of this Court changes existing law in Mississippi by holding that an appellant is entitled to interest while his case is on appeal, although the judgment in effect is adverse to the appellant; (2) the order of December 19, 1984 modifying (clarifying) the decision of this Court creates a new appellate procedure whereby previous decisions of the Court can be substantively modified through motion to the Court after all petitions for rehearing have been denied; and (3) "far-reaching changes which result from this Court's unpublished, unexplained order, is a trap," and the "appellate procedure and new law regarding when a judgment bears interest deserve a published opinion so that all litigants will have notice of the change in the law."
There is no merit in the contentions advanced by Jesco. For the benefit of the Bench and Bar, the law and procedure relative to this question will be briefly stated.
Jesco relies upon Grice v. Central Electric Power Association, 230 Miss. 437, 456, 96 So.2d 909 (1957),[1] for the proposition that no interest should be allowed in the present case, stating in its brief that "The Grice case has never been overruled or modified by this Court and remains as the only case decided by the Mississippi Supreme Court wherein the issue of interest under circumstances where j.n.o.v. has *61 been granted by the lower court and reversed in this Court has been addressed and decided." In Grice, the Court stated:
The judgment of the lower court is likewise reversed in the instant case, and a judgment will be here entered in favor of the plaintiffs for the sum of $60,000, with interest at the legal rate of six percent per annum from the 16th day of March 1956, the date of the judgment which was based upon the verdict of the jury in the lower court.
230 Miss. 437, 455, 92 So.2d 837, 841.
On suggestion of error, the Court, quoting from Johnston v. Canton Flying Services, Inc., 209 Miss. 226, 46 So.2d 533 (1950), noted that this Court reversed the action of the lower court and entered judgment here in favor of the original plaintiff for the amount of the verdict with interest at the legal rate of six percent (6%) from the date of the verdict, but that no suggestion of error was filed in Johnston and the allowance of interest from the date of the verdict was erroneous. The Court stated in Grice, on suggestion of error, that interest shall be allowed not on verdicts, but on judgments and that in Grice there was no valid judgment at the time the verdict was rendered nor thereafter until the decision in Grice on March 4, 1957, in this Court. It was held, therefore, that the judgment in Grice should bear interest only from March 4, 1957, which is the date of the judgment entered in the Mississippi Supreme Court, and the suggestion of error was sustained to that extent.
In its reply brief, Jesco states:[2]
Appellant again attempts to distinguish Grice v. Central Electric Power Assn., 230 Miss. 437, 92 So.2d 837 (1957), by arguing that no judgment was ever entered by the lower court in that case. This is a mistaken interpretation of the case. In the words of the Court:
[A] judgment will be entered in favor of the plaintiffs ... with interest ... from ... the date of the judgment which was based upon the verdict of the jury in the lower court." 92 So.2d at 841.
As the above quote clearly shows, there was a judgment entered on the original jury verdict in Grice.

In Illinois Central R.R. Co. v. Nelson, 245 Miss. 395, 146 So.2d 69, 148 So.2d 712 (1962), on motion to correct judgment, the Court said:
In this case the lower court rendered judgment for wrongful death in the amount of $150,000. This Court, in its original opinion, affirmed the case on liability and on the question of damages provided appellees entered a remittitur for $35,000. The remittitur was duly entered and the judgment was thereupon affirmed in the amount of $115,000.
* * * * * *
Appellants contend that the judgment in this case should bear interest from the date of the judgment of this Court entered after the remittitur was filed by appellees. Appellees contend that the judgment should bear interest from its date in the lower court. Appellants rely on Aetna Life Ins. Co. v. Thomas, 166 Miss. 53, 144 So. 50, but we are of the opinion that this case is not in point because as to interest the issue was resolved on the ground of waiver. Grice v. Central Electric Power Assn., 230 Miss. 437, 92 So.2d 837, is not controlling for the reason that judgment was never entered in the court below and the plaintiffs never obtained judgment until reversal of the lower court and the entry of the judgment here.

The case of Gulf & S.I.R. Co. v. Bond, 181 Miss. 254, 179 So. 355, is directly in point. Judgment for wrongful death was entered for plaintiffs in the lower court for the sum of $10,000. This Court *62 conditionally affirmed if plaintiffs would enter a remittitur of $2500. Remittitur was entered and this Court, on motion, held that the judgment should bear interest from the date of final judgment in this Court.[3]
Appellees also rely on Grillis v. Patrick, 214 Miss. 747, 59 So.2d 341, wherein personal injuries were awarded plaintiff by judgment of the lower court. Defendant appealed and this Court affirmed on liability and conditionally affirmed provided plaintiff would enter a remittitur of $250.00. And the opinion in that case stated: "If the remittitur is entered in this Court, the affirmance for $2700 will bear interest from July 24, 1951, the date of the original judgment." See also Miss. State Highway Com. v. Rogers, 242 Miss. 439, 136 So.2d 216. (Emphasis added)
245 Miss. at 411-412, 148 So.2d at 712-713.
In Jesco, judgment was entered on the jury verdict in the amount of 1.2 million dollars with interest at the rate of eight percent (8%), as provided by law, on May 27, 1981. On January 27, 1982, the lower court sustained the motion of Jesco for a JNOV and set aside the judgment previously entered on the jury verdict in the following language:
It is, therefore, ordered and adjudged that said motion of defendant, Jesco, Inc., for a judgment non obstante verdicto [sic] be, and hereby is, sustained and that the judgment heretofore entered in favor of the plaintiff be vacated and set aside and that judgment be, and hereby is, entered for defendant, Jesco, Inc. Plaintiff is taxed with all costs for which let execution issue.
ORDERED AND ADJUDGED in vacation, this 27th day of January, 1982.
Therefore, under the decisions of this Court, interest at the rate of eight percent (8%) is due on the original judgment entered in this cause May 26, 1981.
With reference to the other two reasons set forth in Jesco's petition for rehearing, we state for the benefit of the Bench and Bar that, when lower court judgments are affirmed by this Court, seldom is it stated in the opinion that the judgment will draw interest from the date of its entry, except in unusual situations. Interest follows the judgment as a matter of law. Judgments on a decision rendered by this Court are drawn by a clerical employee of the Supreme Court Clerk's Office, not by the judge who authored the opinion. In the present case, the judgment entered reads as follows:
This cause having been submitted at a former Term on the record herein from the Circuit Court of Lee County and this Court having sufficiently examined and considered the same and being of the opinion that there is error therein doth order and adjudge that the judgment of said Circuit Court rendered in this cause on the 27th day of January, 1982, be and the same is hereby Reversed and the original judgment of the Circuit Court is reinstated and judgment is rendered here in favor of Talmadge Stubblefield against Jesco, Inc., in the amount of $1,200,000.00. Affirmed on Cross-Appeal. It is further ordered and adjudged that the appellee do pay all of the costs of this appeal to be taxed.
The individual drawing the judgment simply made a clerical mistake in failing to provide for interest at the rate of eight percent (8%) from the date of the judgment entered in the lower court, viz, May 26, 1981. Such clerical error may be corrected by the Court on its own motion, or upon motion of an interested party, and is not a departure from the rules of this Court.
On the motion to clarify the opinion, which is the equivalent of correcting the judgment, this Court simply entered an order that the opinion reflect, at the end of the last paragraph, interest on the judgment *63 be fixed at the legal rate of eight percent (8%) per annum from the date of the lower court judgment. This was for the benefit of the Bench and Bar, otherwise, the judgment would have been corrected and entered on the minutes without adding that provision to the opinion.
In view of the above, the petition for rehearing on the motion to clarify the opinion is denied.
PETITION FOR REHEARING ON MOTION TO CLARIFY OPINION DENIED.
PATTERSON, C.J., WALKER, P.J., and DAN M. LEE, PRATHER, ROBERTSON, SULLIVAN and ANDERSON, JJ., concur.
HAWKINS, J., not participating.
NOTES
[1] The writer participated in the trial and appeal of Grice.
[2] The statement is erroneous. We have had the Grice original record checked, and it indicates that a judgment was entered upon the verdict, but upon filing the motion for JNOV, by agreement of the parties the judgment was withdrawn. Therefore, no valid judgment was entered on the verdict by the lower court. The quote from Grice appears at page 455 of the original opinion and not in the suggestion of error, supra.
[3] The Court further held in Nelson, supra, that Gulf & S.I.R. Co. v. Bond was overruled insofar as it conflicted with the decision in Nelson.