784 So.2d 239 (2000)
Kenwyon WOODARD, a Minor, by His Father and Next Friend, Billy Woodard, Appellant,
v.
John TURNIPSEED, Appellee.
No. 1999-CA-01028-COA.
Court of Appeals of Mississippi.
November 21, 2000.
Rehearing Denied February 6, 2001.
Certiorari Denied May 10, 2001.
*240 Charles T. Yoste, Starkville, Attorney for Appellant.
C. Hugh Hathorn, Louisville, Ronald Stephen Wright, Ackerman, Attorneys for Appellee.
EN BANC.
IRVING, J., for the Court:
¶ 1. Kenwyon Woodard, a minor, by his father and next friend, filed a complaint against John Turnipseed in the Choctaw County Circuit Court seeking personal injury damages. The complaint arises from an assault and battery committed with a broom against him by Turnipseed,[1] a large dairy farmer who, along with his two sons and brother, owned seventeen hundred acres of dairy land.[2]
¶ 2. The jury returned a verdict for Turnipseed. After the denial of his post-trial motion for judgment notwithstanding the verdict, or in the alternative, for a new trial, Kenwyon has appealed, raising the following issues: (1) the verdict is against the overwhelming weight of the evidence, and (2) the trial court erred (a) in not granting his motion for a directed verdict, (b) in granting Turnipseed's jury instruction on self-defense and denying Kenwyon's counter instruction on self-defense.
¶ 3. We find merit in Kenwyon's argument that his motion for a directed verdict as to liability should have been granted. Accordingly, we reverse and render as to liability but remand for a new trial on damages only.

FACTS
¶ 4. On September 7, 1996, Kenwyon was employed as a minimum wage milker with Turnipseed Dairy Farms of Ackerman, Mississippi. He had been working for Turnipseed Dairy Farms approximately six months during his latest employment but had worked for the dairy once before. His first employment with the dairy ended when he, according to Turnipseed, was fired by Turnipseed for not cleaning the cows prior to attaching the milker. On September 7, he was fired again for the same reason. According to Kenwyon, he did not know why he was fired the first time.
¶ 5. On September 7, according to Turnipseed, Kenwyon, along with two other boys, were preparing cows to be milked. One boy was driving the cows into the stalls, another was dipping the cows' udders in disinfectant, and Kenwyon was using paper towels to clean the udders. Turnipseed observed that Kenwyon had passed over three filthy cows. Upon making this observation, Turnipseed told Kenwyon, "you are fired, and go punch out."
¶ 6. Turnipseed claims that when he fired Kenwyon the first time Kenwyon had threatened to get him. Specifically, Kenwyon had said at that time, "I will get you for this." Remembering the previous threat, Turnipseed "thought this boy may vandalize my time clock." Because of this, Turnipseed decided to escort Kenwyon to the time clock. According to Turnipseed, Kenwyon started with a verbal assault as they walked out of the barn. Turnipseed heard the same threat he had heard upon the first firing of Kenwyon. In any event, Turnipseed escorted Kenwyon to the time clock, and Kenwyon changed clothes and *241 telephoned his father to get a ride home.[3] Turnipseed further explained what happened:
A. And as he walked out of the barn Keywon [sic] started a verbal assault. The same one I had heard one repetition of the last time I fired him, except he did it over and over and over the whole time we walked to the time clock.
Q. Now, Mr. Turnipseed, are you telling me that he continued and repetitively told you I am going to get you for this?
A. That is correct.
Q. As he was walking out for minutes and minutes and minutes, I am going to get you for this. I am going to get you for this.
A. He didn't say he was going to hit me. He said I am going to get you.
Q. He said this more than once.
A. Many more times more than once.
Q. How come you didn't tell me that back on May 11, 1998, when I took your deposition?

A. Did we have a deposition?
BY MR. YOSTE: I have a copy, Your Honor. May I approach the witness?
A. May I have a moment to read this?
Q. You certainly may.
* * * *
Q. Would you please point out to me on what page, Mr. Turnipseed?
A. Okay. I have to find it. Okay, It is not in there. It certainly isn't.
Q. Thank you very much.
A. As to why I didn't say that, I don't know.

(emphasis added.).
¶ 7. Turnipseed gave this account of the physical assault:
And now listen to this. Shirley is my foreman. I told her Shirley, I don't care if the cows go dry, don't allow this boy back on the farm. I passed him off to her and went back to the barn and milked.... Ten minutes later I step out of the barn and there is Kenwyon. I said Kenwyon, didn't I tell you not to come back on my farm. Which wasn't quite the truth because I didn't address him. I addressed her in his presence.
* * * *
Kenwyon didn't say anything. I said Kenwyon I am telling you to get off of my property. Kenwyon said I am not going anywhere. I stood there a minute. I looked down. There was a broom leaning against the barn. I picked the broom up. I said Kenwyon, you see this broom. I am telling you to get off my property. Kenwyon didn't respond in any way. I walked the eight steps to Kenwyon, and I hit him three times with the broom. The last lick I hit him, the broom handle cracked. Didn't break. Cracked. Kenwyon decided he wanted to leave my farm, and he did.
(emphasis added).
¶ 8. As might be expected, Kenwyon had a different version as to what transpired. According to Kenwyon, this is what happened:
A. Mr. Turnipseed comes into the barn and, and takes the bar that I was cleaning with from me and touch under the cow tit and tell me I *242 wasn't doing my job right. And he tells me that I am fired and to go and change clothes, change clothes. So I leave out the barn and as I am doing [that], he followed behind me to the place you clock in, clock in and clock out. He followed me in there, and as I am changing clothes he tells me to go outside and change clothes, but I tell him it's too cold. So when I tell him it's too cold he go ahead and let me change.
And he open [sic] the shop so I can use the telephone. And I call my mom house but nobody there. I called my grandma's. So nobody at either one of those houses, so I walk back outside and I walk to the end of the road. After I been out there about five minutes, five, ten minutes I walk back onto thewalk back to my friend's car and sit on it, and sit on my friend's car.
Q. Where did you sit on the car?
A. On the bumper.
Q. Then what happened?
A. Mr. Turnipseed comes out and start cursing, telling me I thought I told you to leave my property and as he walks toward his shop, I turned my head to look at Shirley and Jonathon to see what they were doing.
Q. What were they doing?
A. Feeding some calves.
Q. How far away from you were they?
A. About 20, 20, 50-20 to 25 feet away.
Q. Okay. What happened next, Kenwyon?
A. As I lookedlooking at Jonathon and Shirley I feelI just remember being I'm being hit by Mr. Turnipseed and I fall to the ground. And I just know he strike [sic] me a couple of times. And after I feelI justafter he stop striking me I get up and run to the end of the road and go to Weir.
Q. All right. Now, let me ask you this: What, if anything, did you do to make Mr. Turnipseed attack you?
A. Nothing.
Q. Did you have any type of knapsack?
A. No.
Q. Did you have anything?
A. No, sir.
Q. Where did Mr. Turnipseed come from when he started striking you?
A. From like an angle at the side.
Q. Did you see Mr. Turnipseed coming?
A. No.
¶ 9. As a result of the attack, Kenwyon suffered a hematoma of the right flank, a contusion of the left forearm and some contusion to the kidney. Michelle Parsons, a family nurse practitioner, testified that Kenwyon was kept in the hospital for observations for eight hours because blood was detected in his urine. Parsons testified that the blood in the urine was consistent with the bruised kidney suffered by Kenwyon in the attack. When Kenwyon was admitted to the hospital, "he was in acute distress with pain." To alleviate the pain, Parson gave Kenwyon an injection of nubain. Upon his being discharged, Wood was given a prescription for ibuprofen, 800 milligrams.
¶ 10. After being discharged, Kenwyon was seen for a short period of time by a doctor in Jackson. However, the treatment with the Jackson doctor was discontinued because Kenwyon's family was without medical insurance and could not afford the medical bills.
¶ 11. Billy Woodard, Kenwyon's father, described his son's post-attack behavior this way:

*243 Kenwyon had changed a lot. Anyone who knew Kenwyon would tell you the same thing. Right now he is very withdrawn, and he is just not Kenwyon. I mean he sleeps a lot. He sit here long enough he will go to sleep, and then just sleep. He keeps to himself. He don't participate in no activity in the community, nor with the church choir. He has always sung in the church choir. He doesn't sing with the choir anymore.
He doesn't participate in any activity. As far as like young guy, we always did play basketball. When he comes homehe very seldom get to come home on weekends. Maybe once or twice a month. When he home [sic] he sit and talk [sic] with us for a few minutes, then mostly he is back off to his self [sic] in his room.
¶ 12. At the time of trial, Kenwyon had finished high school and was attending the Job Corp in Crystal Springs. He was studying to become a certified nurse's assistant. He said that he still suffered intermittent pain as a result of the attack.

Analysis of Issues Presented

Did the Trial Court Err in not Granting Kenwyon's Motion for a Directed Verdict?
¶ 13. When a trial court is asked to grant a motion for a directed verdict, the court must:
[C]onsider the evidence on behalf of the party against whom [the] directed verdict is requested, along with all reasonable inferences, in the light most favorable to said party, disregard any evidence of the other party in conflict therewith, and, if the evidence and reasonable inferences to be drawn therefrom would support a verdict for such party, the motion for directed verdict should be denied.
Litton Systems, Inc. v. Enochs, 449 So.2d 1213, 1215 (Miss.1984) (quoting Lewis Grocer Co. v. Williamson, 436 So.2d 1378, 1380 (Miss.1983)).
The motion for a judgment notwithstanding the verdict tests the legal sufficiency of the evidence supporting the verdict. It asks the court to hold, as a matter of law, that the verdict may not stand. Where a motion for a judgment notwithstanding the verdict has been made, the trial court must consider all of the evidencenot just evidence which supports the non-movant's casein the light most favorable to the party opposed to the motion. The non-movant must also be given the benefit of all favorable inferences that may reasonably be drawn from the evidence. If the facts and inferences so considered point so overwhelming in favor of the movant that reasonable men could not have arrived at a contrary verdict, granting the motion is required.
Stubblefield v. Jesco, Inc., 464 So.2d 47, 54 (Miss.1984). The same rule as to the scope of appellate review applies in motions for directed verdicts and judgments not withstanding the verdict. Id. at 1214. With this standard before us, we turn to the evidence in our case.
¶ 14. Turnipseed contends that he attacked Kenwyon in defense of self and property. Turnipseed argues that because Kenwyon had threatened to get him on a previous occasion as well as on the occasion giving rise to this appeal, he reasonably feared for his safety and the safety of his property. He contends that this is particularly true in light of the fact that he told Kenwyon to leave, but Kenwyon refused to do so.
¶ 15. We first recognize that if the facts showed that Turnipseed or his property were imperiled by Kenwyon, he would have had a legitimate right to defend himself *244 and his property, but using only such force as would have been reasonably necessary to accomplish the task. Did the facts show any such peril? The answer is an emphatic "no."
¶ 16. We look to the evidence in the light most favorable to Turnipseed. Turnipseed testified that, while he was escorting Kenwyon out of the barn to the time clock, Kenwyon repeated over and over again that Kenwyon was going to get Turnipseed. Kenwyon did nothing other than make this threat. Turnipseed went back into the barn and began to assist with the milking operation. Ten minutes later, Turnipseed sees Kenwyon sitting on a car parked on Turnipseed's property. Kenwyon has nothing in his hands and is doing nothing other than sitting on the car. Turnipseed says to Kenwyon, "didn't I tell you not to come back on my farm," and Kenwyon did not say anything. Turnipseed then tells Kenwyon to get off Turnipseed's property. Kenwyon says, "I am not going anywhere." Turnipseed picks up a broom and again tells Kenwyon to get off Turnipseed's property. Kenwyon does not respond. Turnipseed then walks eight steps to Kenwyon and hits him three times with the broom.
¶ 17. This evidence clearly shows that neither Turnipseed nor his milking operation was in any danger of being attacked by Kenwyon, the ninety-five pound minor. Turnipseed knew that Kenwyon had not been able to reach anyone to get a ride off the property because Turnipseed was there when the unsuccessful calls were made. Further, Turnipseed knew that Kenwyon did not possess his own transportation and that Kenwyon's father or mother transported him to and from work at Turnipseed's Dairy Farm.
¶ 18. When Turnipseed approached Kenwyon just before the attack, Kenwyon was not near any of the milking operations. He had not come back into the barn or given any indications that he was attempting to do so. It had been at least ten minutes since he had been escorted out of the barn. Surely, that was enough time for him to return and launch any attack he wanted to make if indeed he had planned to do so.
¶ 19. The record is unclear as to how far Kenwyon lived from Turnipseed's dairy farm, but there is some indication that it was at least between five and ten miles. Having failed to reach anyone at his home or his grandmother's house, Kenwyon was left with the options of walking the distance, however far, or waiting until his friend got off work. Under these circumstances, it was not unreasonable for Kenwyon to wait for a ride home. Granted, when he was accosted by Turnipseed and told to leave, he should have left, but his failing to do so did not justify the brutal attack by Turnipseed, especially considering the fact that Kenwyon was a minor with no available means of leaving except on foot.
¶ 20. Moreover, the record is clear that Turnipseed really never viewed Kenwyon as a threat to either his person or his property. Consider this testimony:
Q. And when you struck him, did he get off your property?
A. The first two times he stood there and glared at me. After the third blow he started off my property.
Q. And hedid he run off the property?
A. I just observed the first few steps. I was satisfied that he was no longer an immediate threat, and I went back to work.
Surely, if Turnipseed had been concerned that Kenwyon had intentions of attacking him or sabotaging his milking operations, he would have observed Kenwyon for more *245 than "the first few steps," and he certainly would not have gone immediately back to work. He would have stayed around to see just what Kenwyon was going to do.
¶ 21. The evidence leads us to the inevitable conclusion that the trial court erred in not granting Kenwyon's motion for a directed verdict. Viewing the evidence in the light most favorable to Turnipseed, as we are required to do and have done in the preceding discussion, we are convinced that reasonable and fairminded persons could not have concluded that Turnipseed, a fifty-seven year old mature man weighing one hundred forty-five pounds, believed himself or his property in danger of attack from 4' 9", ninety-five pound Kenwyon. Accordingly, we reverse and render on the question of Turnipseed's liability but remand the case for a new trial on damages only.
¶ 22. Because we have concluded that Kenwyon's motion for a directed verdict should have been granted, it is not necessary that we discuss the other issues raised by him in this appeal. We remand for further proceedings consistent with the findings expressed in this opinion.
¶ 23. THE JUDGMENT OF THE CIRCUIT COURT OF CHOCTAW COUNTY AFFIRMING THE VERDICT OF THE JURY IN FAVOR OF THE APPELLEE IS REVERSED AND RENDERED AS TO THE APPELLEE'S LIABILITY AND REVERSED AND REMANDED FOR A NEW TRIAL ON DAMAGES ONLY. ALL COSTS OF THIS APPEAL ARE ASSESSED TO THE APPELLEE.
KING P.J., BRIDGES, LEE, MYERS, PAYNE, AND THOMAS, JJ., CONCUR. SOUTHWICK, P.J., CONCURS WITH SEPARATE WRITTEN OPINION JOINED BY McMILLIN, C.J., AND MOORE, J.
SOUTHWICK, P.J., CONCURRING.
¶ 24. I agree that there was no evidence to support a defense of self or property from imminent harm. There was some evidence of another justification, and a partial instruction on the issue. That justification is important here, but the defendant did not adequately request the jury to consider it. Therefore I agree to the entering of judgment on liability and remanding on damages.
¶ 25. The majority has been thorough in its explanation of the evidence. I find, though, several comments on the weight of different aspects of the evidence, a matter procedurally entrusted to the discretion of a jury. The seriousness of the injuries caused by Turnipseed, the importance of the fact that Turnipseed weighed about 150 pounds and Woodard about 100, and indeed whether striking someone with a broom handle three times is a "brutal" attack, all judge the importance of specific admissible evidence over other such evidence, a task for juries. I also find that the majority is viewing the evidence omnisciently, "knowing" as Turnipseed perhaps did not that Woodard had returned after initially leaving just in order to wait for a ride. However the contested evidence still leaves me to agree with the majority that there was no imminence to any harm. That controls.
¶ 26. I proceed to the legal issues. Though various issues are raised, all present the proposition that no justification existed for Turnipseed's actions. The key segments to the argument that I will discuss are the legal standard and the jurors' instruction on the standard.

1. Legal justifications for assaulting another
¶ 27. The principal alleged justification for Turnipseed's assault of Woodard was self-defense. That is an affirmative defense *246 upon which the defendant has the burden of proof:
A defense to the charge of assault or battery is that the person was acting in self-defense. In such a situation, he "is privileged to use reasonable force not intended to cause death or serious bodily harm, to defend himself against unprivileged harmful or offensive contact or other bodily harm which he reasonably believes that another is about to inflict intentionally upon him."
Webb v. Jackson, 583 So.2d at 950-51 (Miss.1991), (quoting RESTATEMENT (SECOND) OF TORTS § 63 (1965)).
An assault also can be privileged if it is necessary to protect one's property. One has a right to defend his home and the members of his family and other persons in the home, and to protect his property from intruders and trespassers. But one does not have the right to use means that are unreasonable, or force in excess of the force reasonably necessary, to prevent the intrusion.
Anderson v. Jenkins, 220 Miss. 145, 150, 70 So.2d 535, 538 (Miss.1954).
¶ 28. The mere fact that a trespass occurs does not justify the use of deadly force or the infliction of great bodily harm. Anderson, 220 Miss. at 151, 70 So.2d at 538. Reasonable force can include deadly force "only if the actor reasonably believes that the intruder, unless expelled or excluded, is likely to cause death or serious bodily harm to the actor or to a third person whom the actor is privileged to protect." RESTATEMENT (SECOND) OF TORTS § 79 (1965).
¶ 29. The final possible justification is a subset of what has just been described, but it is worth discussing as a separate matter. This justification does not require a threat of imminent harm, but it is the right of a person in possession of property to use reasonable force to evict a trespasser. The harm is just the presence of an obstinate trespasser. The rule permits a landowner whose demand upon a trespasser to leave has been ignored, to use the force reasonably perceived as necessary to remove the intruder. Western Union Telegraph Co. v. Stacy, 162 Miss. 286, 139 So. 604, 605 (1932). Cited for this proposition was a criminal case holding "that a person has the right to preserve the peace at his own home and to evict from his home and premises persons who are creating disturbances upon his premises." Cotton v. State, 135 Miss. 792, 796, 100 So. 383 (1924).
¶ 30. However, this rule goes beyond threatened or existing "disturbances." I find the following to be an apt statement of the elements:
An actor is privileged to use reasonable force, not intended or likely to cause death or serious bodily harm, to prevent or terminate another's intrusion upon the actor's land or chattels, if
(a) the intrusion is not privileged or the other intentionally or negligently causes the actor to believe that it is not privileged, and
(b) the actor reasonably believes that the intrusion can be prevented or terminated only by the force used, and
(c) the actor has first requested the other to desist and the other has disregarded the request, or the actor reasonably believes that a request will be useless or that substantial harm will be done before it can be made.
RESTATEMENT (SECOND) OF TORTS § 77 (1965). This rule would not permit the use of deadly force, but it strikes a balance short of such severe measures by assuring that people without authorization to be on property can be physically removed without having to await the commission of an overtly menacing act. Whether Turnipseed *247 raised this defense will be discussed in the next section.

2. The instruction on justification
¶ 31. This is the language of the instruction describing Turnipseed's justification:
You are instructed that a person has the right to use reasonable force to defend himself and his property against unprivileged and unjustified contacts, attacks or intrusions that he reasonably believes another is about to inflict. Accordingly, if you find from a preponderance of the evidence in this case that on September 7, 1996:
1. John Turnipseed reasonably believed that Kenwyon Woodard was about to inflict an unprivileged or unjustified attack or intrusion upon John Turnipseed or upon John Turnipseed's property; and
2. John Turnipseed used force against Kenwyon Woodard for the purpose of protecting himself or his property; and
3. John Turnipseed's use of this force was no greater than reasonably necessary to protect himself or his property; then your verdict shall be for the defendant on the claim made against him.
¶ 32. The issue of defense of self or of property against unjustified "contacts" or "attacks" was presented. The jury also was directed to consider that Turnipseed could prevent an unjustified "intrusion" that Woodard "was about the inflict." No physical attack or contact occurred, so whether an attack was imminent was given as an issue to the jury. I agree with the majority that no factual issue on imminence was raised.
¶ 33. As to an "intrusion," it was not imminent since it had already occurred. As indicated from the Restatement, a landowner has the right to use reasonably necessary force to evict a trespasser once a demand has been made or it is obvious that a demand would be futile. It is also important that the force used not be such as is likely to cause death or serious bodily injury. The jury was not asked explicitly to consider these elements.
¶ 34. I cannot find the elements sufficiently implicit either. The concept of a land-owners' right to prevent an intrusion, separate from his right to prevent imminent harms to persons or property, is in this instruction. Yet even though the word "intrusion" appears, it is in the context of imminent harm since the jury was to decide if "Woodard was about to inflict an unprivileged or unjustified attack or intrusion upon John Turnipseed or upon John Turnipseed's property...." I find that Turnipseed never properly raised the defense of a right to evict trespassers.
¶ 35. I concur in the judgment.
McMILLIN, C.J. AND MOORE, J., JOIN THIS SEPARATE OPINION.
NOTES
[1] Turnipseed was a fifty-seven year old mature man weighing one hundred forty-five pounds while Kenwyon was a seventeen year old boy weighing approximately ninety-five pounds and standing only 4'9" tall.
[2] This is an unusually large operation, approximately four times the average size of U.S. dairy farms. Turnipseed milks approximately four hundred fifty cows daily.
[3] According to Kenwyon, he called his mother's and grandmother's homes, but neither was home.